(A.R.D. 261)

ROBERT E. LANDWEER & CO., INC.,

A/C ROBERT NEWTON & SONS, INC., ET AL.

*v.* UNITED STATES

Entry No. 13698, etc.

## Second Division, Appellate Term

(Decided September 19, 1969)

*Glad & Tuttle* (*Edward N. Glad* of counsel) for the appellant.
*William D. Ruckelshaus*, Assistant Attorney General (*Mollie Strum*, trial attorney), for the appellee.

Before RAO, FORD, and NEWMAN, Judges

RAO, Chief Judge: This is an application for review of a decision and judgment of the trial court which sustained the appraised values of two wooden hull boats exported from Hong Kong and entered at the port of Seattle, Washington. *Robert E. Landweer & Co., Inc., a/c Robert Newton & Sons, Inc., et al.* v. *United States*, 59 Cust. Ct. 648, R.D. 11359 (1967).

The boat involved in R66/16587 is a Grand Banks 36 power cruiser, which is the 5th boat of that model, referred to as hull #5, and that in R66/16588 is a Magellan 35 motorsailer, hull #2. The Grand Banks 36 was entered at the invoice price of $14,900 f.o.b. with freight and insurance payable at destination. It was appraised at $20,015 net, packed. The Magellan 35 was entered at the invoice price of $14,850 f.o.b. with freight and insurance payable at destination. It was appraised at $17,992 net, packed.

It was stipulated that the merchandise does not appear on the Final List promulgated by the Secretary of the Treasury, 93 Treas. Dec. 14, T.D. 54521, and that the proper basis of appraisement is export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

Both boats were manufactured and shipped by American Marine Ltd. directly to Salmon Bay Marina, Seattle, Washington, the ultimate purchaser. Entry of the Grand Banks 36 was made by Robert E. Landweer & Co., Inc., customs broker, for the account of Robert Newton & Sons, Inc. A declaration that Robert Newton & Sons, Inc.

was the actual owner for customs purposes was signed by Robert Newton as a member of that firm.

The Magellan 35 was entered in the name of Salmon Bay Marina. A special customs invoice lists Robert Newton & Sons, Inc. as the purchaser. Attached to the official papers is a copy of an invoice from Robert Newton & Sons, Inc. to Howard H. Cole at Seattle covering the said Magellan 35 at a price of $17,992. A further statement certifies that the merchandise was sold to Howard H. Cole and thence to Howard H. Cole, dba Salmon Bay Marina, while in transit to the United States.

The appellants contend that Robert Newton & Sons, Inc. is the purchaser of the yachts from the manufacturer, American Marine Ltd., at the price of $14,900 for the Grand Banks 36 and $14,850 for the Magellan 35 and that appraisement should have been made at those prices. Appellee contends that the Newton family controlled both Robert Newton & Sons, Inc. and American Marine Ltd.; that Robert Newton & Sons, Inc. was a sales agent for the manufacturer and not a *bona fide* purchaser, and that the freely offered prices are the prices at which the yachts were sold to Salmon Bay Marina.

The trial court found that the record did not depict an ordinary course of trade between American Marine Ltd. and Robert Newton & Sons, Inc.; that the situation disclosed was inconsistent with a buyer-seller relationship; that Robert Newton & Sons, Inc. was the *alter ego* or business conduit of American Marine Ltd., and that the unusual close "affinity" and course of conduct of Robert Newton, Robert Newton & Sons, Inc., and American Marine Ltd. precluded a finding for plaintiffs.

In order to establish export value under section 402 (b) and (f) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, the importer is required to prove the price at which the merchandise was freely sold, or, in the absence of sales, offered for sale, to all purchasers for exportation to the United States in the usual wholesale quantities and in the ordinary course of trade, or to show that in the ordinary course of trade the merchandise was sold or offered for sale to one or more selected purchasers and that the price at which it was sold or offered fairly reflected the market value.

Here appellants do not claim that the merchandise was freely sold or offered for sale to all purchasers. They contend that in the ordinary course of trade American Marine Ltd. sold or offered its boats to an exclusive purchaser in the United States and that during the period of exportation involved herein, Robert Newton & Sons, Inc. was the selected purchaser.

According to the record, American Marine Ltd. was formed in 1957 to engage in boat building in Hong Kong. Mr. Robert Newton and

his sons owned 83 percent of stock of the company. As managing direc-
tor, Mr. Robert Newton is in direct charge of the operations of the busi-
ness and his son Whitney is next under him. Prior to October 1963, the
company manufactured custom pleasure boats which were sold to a
firm in the United States known as Products of Asia. At about that
time, American Marine Ltd. started to produce stock boats and this re-
lationship was terminated. In January 1964, Mr. Newton formed a
corporation located in Costa Mesa, California, known as Robert New-
ton & Sons, Inc. (hereinafter called the Newton company), which was
to be the sales representative of American Marine Ltd. in the United
States. After formation of the company he sought someone "to take over
that corporation" and found one Thomas C. Carney, who eventually
was named its president and its stock was transferred to him.

Under date of April 7, 1964 a statement addressed to American
Marine Ltd. (exhibit 1) on the letterhead of the Newton company was
signed by Mr. Carney and countersigned by American Marine Ltd.
by Robert Newton. It states:

> I am to be sole representative for American Marine Ltd. for Ma-
> gellan 35 and the Grand Banks 36.
>
> When, and if, other boats are added to the line, they will come un-
> der this agreement on a mutually agreeable arrangement.
>
> I will buy these boats at your offered prices and will sell them to
> the dealers at the prices you recommend.
>
> I will use my best efforts to promote the sale of these boats and per-
> form the necessary service as liaison between American Marine
> Ltd., and the dealers.

Appellants claim that by this agreement the Newton company be-
came the exclusive purchaser and that only between October 1963 and
April 7, 1964 did American Marine Ltd. sell directly to boat dealers.

Mr. Newton testified that American Marine Ltd. started construc-
tion of the Magellan 35 and the Grand Banks 36 in the fall of 1963
or in January of 1964. He said that of the first six Grand Banks pro-
duced, four were sold direct to dealers and two to the Newton company,
all at $14,900. Twelve Magellans were produced and all were sold at
the same basic price of $14,850. Mr. Newton stated that since April 7,
1964 all were sold to the Newton company. There is corroborative evi-
dence as to some sales of Grand Banks at $14,900, but there is also evi-
dence of a sale directly to Philip Lelienthal at $20,860.

Assuming, *arguendo*, that the Newton company was the selected
purchaser within the meaning of section 402 (b) and (f) of the Tariff
Act of 1930, as amended, it must be shown that the claimed prices of
$14,900 for the Grand Banks and $14,850 for the Magellan fairly re-
flect the market value. While there is no "hard-and-fast" rule as to

what proofs are required to establish that the price to a selected customer fairly reflects market value, facts must be shown from which the court can make the determination. Conclusory statements of a witness unsupported by records of sales are not enough. *Mannesmann-Meer, Inc.* v. *United States*, 57 Cust. Ct. 697, R.D. 11243 (1966), aff'd 62 Cust. Ct. 1023, A.R.D. 253 (1969) (appeal pending); *J. E. Bernard & Co., Inc.* v. *United States*, 58 Cust. Ct. 598, R.D. 11265 (1967).

One basis of comparison is the price at which the merchandise is sold for home consumption or for exportation to countries other than the United States. For this purpose all sales in the ordinary course of trade may properly be considered. *United States* v. *Acme Steel Company*, 51 CCPA 81, C.A.D. 841 (1964). In the instant case, Mr. Newton testified that boats manufactured by his firm were sold principally to the United States, but that sales had been made to Australia and Europe, and quite a few in Asia. There is not a scintilla of evidence in the record to show at what prices and in what manner the boats were offered or sold in those markets.

Another basis which may be helpful in determining whether the price to the selected purchaser fairly represents market value is the cost of producing the merchandise, including overhead and profit. Mr. Newton testified that he and his sons and others in the office found the cost of the materials in the boats, estimated the labor costs, and then fixed the selling price. Total costs for certain of the Magellans were given but it is not clear whether they included all elements entering into the cost of production. A price which does not include all such elements does not *per se* fairly reflect market value. *John V. Carr & Son, Inc.* v. *United States*, 52 CCPA 62, C.A.D. 860 (1965). In defendant's collective exhibit E, which includes two reports of Customs Representative Perry J. Spanos, it is noted that the difference between the selling price and the total costs given to Mr. Spanos by one of Mr. Newton's sons, was not the same for each boat and ranged from 2.5 or 3 percent to 11 percent. Mr. Newton testified that the profit was 5 or 6 percent. According to the report, discreet inquiries indicated that the profit usually realized in the industry was never below 15 percent.

While Mr. Newton testified that American Marine Ltd. was one of the largest builders of wooden boats in the world, he stated that there were three yards in Hong Kong which built boats for export. He said one built fiberglass boats principally and that the other two produced custom made boats ranging from lightweight power boats to heavy motorsailers. Appellants claim that the latter are not comparable to the instant stock boats on the ground that they are custom built, but there is no testimony to indicate that they are not otherwise comparable or at what prices they were offered or sold.

In the first of the two reports in exhibit E, dated March 29, 1965, Mr. Spanos stated that he interviewed one of the Newtons (said in the first report to have been John R. Newton, Jr., and in the second to have been Whitney Gill Newton) and that the interviewee had said that the prices charged for merchandise ordered directly and not through the Newton company were 20 to 25 percent higher than those charged the Newton company. At the second interview, Mr. Whitney Gill Newton stated, according to the report, that the same merchandise definitely would not be sold directly to any purchasers at the same unit values if the sales were not handled through his father in Costa Mesa.

We conclude that the evidence is insufficient to establish that the prices claimed fairly reflect the market value of the merchandise herein.

Furthermore, we are in accord with the decision of the trial court that the Newton company was not a *bona fide* selected purchaser and that the relationship between American Marine Ltd. and the Newton company was not consistent with that of buyer and seller but was compatible with that of seller and selling agent.

The facts presented on this point are set forth in some detail in the opinion of the trial court. As noted previously, the Newton company was formed by Robert Newton, the managing director and a major stockholder of American Marine Ltd. When the Newton company began operations, Mr. Newton acted for it, calling on dealers and traveling all over the United States. He served as treasurer until the end of August 1964. While Mr. Carney was supposed to manage the corporation from the beginning of April 1964, he worked only nights and weekends until the end of August. Thereafter, Mr. Newton continued to supervise and assist him and held a power of attorney to sign checks, manage the office, make loans, and transact all the business of the company. He used the offices of the Newton company in connection with work for that company and for American Marine Ltd.

Although Mr. Newton testified that American Marine Ltd. advanced $40,000 or $50,000 to the Newton company and that repayments were made from time to time, no financial statement has been presented to substantiate this. Mr. Newton and his family used the checking account of the Newton company to pay their personal expenses. The evidence does not show repayments to the company.

Mr. Newton testified that the Newton company was organized to be sales representative for American Marine Ltd. An application for a permit to issue securities filed February 14, 1964 (exhibit A) states:

> The Applicant was incorporated for the purpose of engaging in the business of representing foreign boat builders as a sales agent in the United States, * * *.

While the agreement of April 7, 1964 (exhibit 1, *supra*) states that "I" (presumably the Newton company) will buy these boats, it also uses the terms "sole representative" and "liaison between American Marine Ltd. and the dealers."

According to the report of Customs Representative Perry J. Spanos dated March 29, 1965 (collective exhibit E), one of Mr. Newton's sons stated: "Robert Newton & Sons, Inc. acts as the selling agent for American Marine." According to a second report dated October 21, 1965, Mr. Whitney Gill Newton stated that the Newton company was formed personally by Mr. Robert Newton to be the exclusive selling agent of American Marine Ltd. and that the majority of the profit went to the Newtons "by having the Newtons draw substantial amounts of money from Robert Newton and Sons Inc. as salaries and/or sales commissions so that there is no profit ever shown for the shareholder, T. C. Carney."

Appellants claim that these reports should not be given greater weight than the sworn testimony, citing *Lollytogs, Ltd.* v. *United States*, 55 Cust. Ct. 608, Reap. Dec. 11073 (1965). In that case there was testimony that Swedish Trading was the buying agent of the plaintiff. This was corroborated by the affidavits of the managing director of Swedish Trading and by a summary of an interview conducted by the customs agent with two officials of the company. The court noted that the agent's report of interviews with representatives of several foreign manufacturers tended to present a contrary picture. It concluded, however, that the manufacturers' descriptions of the relationships of the various parties were the lay opinions of persons not qualified to define legal status and that the report was at best a summary of conversations reputed to have been held with these people, and being in the form of an unverified statement, was not entitled to as much weight as the positive sworn testimony of the witness. It observed that the testimony set forth more than conclusions, and gave a detailed description of the services rendered by Swedish Trading and its role in the purchase of the merchandise, which enabled the court to determine the status of the parties.

In the instant case, the reports contain some material which is corroborative of other evidence and some which is in contradiction to the testimony of Mr. Robert Newton. Most of the contradictory material consists of information given to the agent by one of Mr. Newton's sons, who was in charge of American Marine Ltd. in his father's absence. Mr. Newton's testimony, moreover, is not so clear and convincing as to enable the court to determine the status of the Newton company. Under these circumstances, the reports were properly considered together with other evidence. Cf. *Fine Arts Bag Co.* v. *United States*, 56 Cust. Ct. 597, Reap. Dec. 11128 (1966).

The facts and circumstances revealed by the record herein indicate that the Newton company was not an independent entity but was under the control of Mr. Robert Newton or of American Marine Ltd. Mr. Newton carried on or supervised its activities and had the authority to manage its affairs. Its profits did not inure to the benefit of its stockholder, Mr. Carney, but were distributed to the Newton family or to American Marine Ltd. There is nothing to indicate that it ever acted independently of the Newtons.

In *Dorf International, Inc., et al.* v. *United States*, 61 Cust. Ct. 604, A.R.D. 245 (1968), the court pointed out that the decisive consideration which distinguishes a principal-agent relationship from a buyer-seller relationship is the right of the principal to control the conduct of the agent with respect to the matters entrusted to him. It also noted that the relationship is to be determined by the substance of the transaction, not by the labels the parties attach to it; that no single factor is determinative, and that an overall view must be taken of the entire situation. See also *Park Avenue Imports* v. *United States*, 62 Cust. Ct. 1035, A.R.D. 255 (1969).

A corporation may be an independent entity or it may be an agent of an individual or another corporation. Whether an agency exists is ordinarily a question of fact which may be established as any other fact, by direct or circumstantial evidence, and is to be determined from the agreements and acts of the parties. 3 Am. Jur. 2d, *Agency*, sec. 21. A corporation may be an *alter ego* or business conduit of another and its separate corporate existence will not be recognized where it is so organized and controlled and its business conducted in such a manner as to make it merely an agency or instrumentality of the other corporation. 18 Am. Jur. 2d, *Corporations*, secs. 15 and 17; *Mayo* v. *Pioneer Bank & Trust Company*, 270 F. 2d 823 (1959) (reh. den., per curiam) 274 F. 2d 320 (1960), cert. den. 362 U.S. 962 (1960); *Schlamowitz* v. *Pinehurst, Inc.*, 229 F. Supp. 278 (1964); *Forest Hill Corporation* v. *Latter & Blum*, 249 Ala. 23, 29 So. 2d 298 (1947).

On the record presented we find that the Newton company was the selling agent of American Marine Ltd. and not a *bona fide* selected purchaser. Therefore, the prices at which the merchandise was invoiced to the Newton company do not represent export value, as that value is defined in section 402 (b) and (f) of the Tariff Act of 1930, as amended.

We are in accord with the conclusion of the trial court that appellants have failed to established their claim that $14,900 and $14,850 represent the export value of the boats involved in R66/16587 and R66/16588. Hence the appraised values of $20,015 and $17,992 have not been overcome and should remain in full force and effect as presumptively correct (28 U.S.C., section 2633).

We find as facts:

1. That the merchandise in R66/16587 consists of one 36 foot Grand Banks power cruiser complete with engines, exported by American Marine Ltd., Hong Kong, on or about August 29 or 30, 1964, and entered at Seattle, Washington, on September 28, 1964. Entry was made at the invoice price at $14,900 f.o.b. with freight and insurance payable at destination. This boat was appraised at $20,015, net packed, on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165.

2. That the merchandise in R66/16588 consists of one 35 foot Magellan class motorsailer, exported by American Marine Ltd., Hong Kong, on or about July 27, 1965, and entered at Seattle, Washington, on August 13, 1965. Entry was made at the invoice price of $14,850 f.o.b. with freight and insurance payable at destination. This boat was appraised at $17,992, net packed, on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

3. That both boats were shipped directly to Salmon Bay Marina, Seattle, Washington, by American Marine Ltd., Hong Kong.

4. That in R66/16587 entry was made by the customs broker Robert E. Landweer & Co., Inc., of Seattle, Washington, for the account of Robert Newton & Sons, Inc., and in R66/16588 entry was made by Salmon Bay Marina, c/o Robert E. Landweer & Co., Inc.

5. That the imported merchandise does not appear on the final list, 93 Treas. Dec. 14, T.D. 54521, promulgated pursuant to the Customs Simplification Act of 1956, *supra*.

6. That counsel agree that export value as defined in section 402(b) of the Tariff Act of 1930, as amended, is the proper basis for appraisement.

7. That there is no evidence to show at what prices such boats were offered or sold for home consumption or for exportation to countries other than the United States, although there is testimony that they were sold to Australia, Europe, and Asia.

8. That the evidence does not show whether the cost figures given included all the elements entering into the cost of producing the boats, including overhead and profit.

9. That the evidence does not establish that boats sold by other shipyards in Hong Kong were not comparable nor at what prices they were sold.

10. That the evidence shows that Robert Newton & Sons, Inc., was organized to be the sales representative or sales agent of American Marine Ltd.; that it was controlled by Mr. Robert Newton, as an indi-

vidual or as managing director of American Marine Ltd.; that he carried on or supervised its activities, and that its profits did not inure to the benefit of the stockholder, but were distributed to the Newton family, principal owners of American Marine Ltd.

We conclude as matters of law:

1. That the evidence does not establish that the involved boats were freely sold or offered to all purchasers in the United States or that the prices at which they were claimed to have been sold, or offered for sale, to Robert Newton & Sons, Inc. fairly reflected the market value of the merchandise.

2. That the business relationship between American Marine Ltd., and Robert Newton & Sons, Inc., is not consistent with that of a buyer and seller but is compatible with a relationship of seller and selling agent.

3. That Robert Newton & Sons, Inc. was the selling agent for American Marine Ltd., of which Robert Newton was a major stockholder and managing director.

4. That the record does not establish that the values claimed by appellants represent the export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

5. That the appraised values which are presumptively correct must be affirmed.

The decision and judgment below are affirmed.

Judgment will be entered accordingly.