**J. L. WOOD**

v.

**UNITED STATES.**

**R.D. 11766, Reappraisements R69/593, R69/1208 and R69/1391.**

United States Customs Court,
March 30, 1972.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz and Irving Levine, New York City, of counsel) for plaintiff.

L. Patrick Gray, III, Asst. Atty. Gen. (Patrick D. Gill, New York City, trial atty.), for defendant.

FORD, Judge:

The appeals for reappraisement listed above were consolidated for the purpose of trial. They contest the appraised value of various engine heaters and car warmers manufactured in Canada by James B. Carter, Ltd., hereinafter referred to as Carter, Ltd., and sold to its American subsidiary, James B. Carter, Inc., hereinafter referred to as Carter, Inc.

Appraisement was made on the basis of export value as defined in section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 70 Stat. 943, at various prices less freight allowance plus $1.50 surcharge, less included brokerage fee prorated, less included duty at 10 percent. These values, defendant contends, are the correct dutiable values.[1]

Plaintiff also believes the proper basis of appraisement is section 402(b), export value, but it contends the proper dutiable values are the invoiced prices. Since both parties contend the proper basis is under section 402(b), *supra*, it is apparent the parties agree the merchandise does not appear on the so-called final list, T.D. 54521.

The pertinent statutory provision involved provides as follows:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing merchandise in condition, packed ready for shipment to the United States.

The record consists of a prior record made in the cases of reappraisements R69/1392 and R69/1583 which were abandoned as well as the testimony of three witnesses called on behalf of plaintiff and two on behalf of defendant, and nine exhibits received on behalf of plaintiff and five on behalf of defendant. It is to be noted that the invoices covered by R69/1391 and R69/1208 include invoices to John Deere which were appraised as entered and are not involved in this action. This matter has been

---

1. An alternative claim by defendant for constructed value under section 402(d) not being pressed is deemed abandoned.

limited to the following items identified on the invoices:

No. 782
No. 772
No. R–56
No. CU–10T
No. R–48
No. R–52
No. 11763–30
No. R–48A
No. R–52B
No. T–96B

■ The invoiced prices are in U.S. dollars with duty and freight payable by Carter, Inc., and not included in the unit prices. It is evident that the transactions between Carter, Ltd., and Carter, Inc., are between related parties within the purview of section 402(g) as the respective corporations have the same officers, etc.

The record establishes that sales by Carter, Ltd., to the United States were made to Carter, Inc., and original equipment manufacturers, hereinafter referred to as O.E.M. account, such as General Motors, American Motors, Cummins Engine, etc. Sales were also made to those accounts considered to be classified as O.E.M. accounts such as General Trading Co. and National Cooperative Association. All of these accounts were given the price for O.E.M. accounts.

Carter, Inc., had no salaried employees in the United States, but did have a number of manufacturer's representatives who received a commission on the net invoice sale price. The manufacturer's representatives were required to appoint warehouse distributors and/or jobbers in their territory to properly service the area as per the terms of collective exhibit D. The stock of Carter, Inc., was kept in a separate area of the Union Storage and Transfer Company of Fargo, North Dakota, which shipped the merchandise to approved customers of Carter, Inc., or its representative. The accounts were billed by Carter, Inc., and were paid to Carter, Inc. All billing and the receipt of money was at Winnipeg, Canada, which is the office of Carter, Ltd. The accounting and data processing center was located there. The funds for Carter, Inc., were entered in the books of said company and deposited in its own account in the Fargo National Bank in Fargo. A sign approximately 2½ feet by 3 feet was at the front door outside the warehouse. All federal excise taxes were paid by Carter, Inc., from funds maintained at the Fargo National Bank. The warehouse was paid storage charges and service fees by checks drawn on the Fargo National Bank. The warehouseman would reorder when stock was low.

The terms of sale by Carter, Ltd., to Carter, Inc., and O.E.M. accounts were net 30 days which were paid by check. It further appears from the record that Carter, Inc., did not sell to O.E.M. accounts in the United States although there was no restriction as to such sales, and in fact it appears in addition that conditions in the trade, at the time involved, were normal; that Carter, Inc., purchased for resale; that the principal market was Winnipeg; that the price did not vary because of quantity; that the price included all coverings and containers and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Carter, Inc., had its own price lists, sales and warranty policies, and did its own advertising separate and apart from Carter, Ltd. It also maintained a large inventory in the United States in Fargo and Cleveland, Ohio. Carter, Inc., also purchases domestically manufactured items from other than Carter, Ltd. Carter, Inc., was given the O.E.M. price since it is on the same level of distribution as an O.E.M., i.e., to purchase, hold and distribute merchandise to warehouse distributors and jobbers. O.E.M. accounts also utilize some of the products in their own articles of manufacture and also follow the above pattern of distribution.

■ The issue presented is twofold. Firstly, is the relationship between Carter, Inc., and Carter, Ltd., inconsist-

ent with buyer and seller. Secondly, if the facts established the transactions to be sales, do they fairly reflect market value. The question of whether Carter, Inc., a separate domestic corporation, is an independent entity or an agent of and conduit for the sales of Carter, Ltd., is answered in the negative with respect to the latter.

It is apparent from the record that Carter, Inc., is an independent entity. It has (or had during the period in dispute) its own room in the warehouse of Union Storage and Transfer Company in Fargo, with the name James B. Carter, Inc., prominently displayed at the entrance to the building. Carter, Inc., has its own bank account at the First National Bank and Trust Company of Fargo, and pays federal excise taxes in the United States. Additionally, Carter, Inc., employs and pays a number of sales representatives in the United States to sell the products which it buys from Carter, Ltd. Resale prices in the United States are established by Carter, Inc. It buys some merchandise in the United States from sources other than Carter, Ltd. Carter, Inc., issues its own warranty, price lists, and disseminates its own catalogues in the United States. Trade policies of Carter, Inc., differ from those of Carter, Ltd. A substantial inventory in the United States is maintained by Carter, Inc. The invoices to its customers are paid to James B. Carter, Inc., although for the sake of convenience the remittances are mailed to Winnipeg where deposit slips are made up and sent to the bank in Fargo. Carter, Inc., pays its own bills for storage and handling to Union Storage and Transfer Company in Fargo. Orders for goods came directly to Carter, Inc., at 806 Northern Pacific Avenue in Fargo. Invoices to Carter, Ltd., are paid by checks issued by Carter, Inc., upon terms of net, 30 days, in the same manner as all other customers of Carter, Ltd. Purchases by Carter, Inc., from Carter, Ltd., were carried on the former's books as accounts payable to Carter, Ltd., and on Carter, Ltd.'s books as accounts receivable from Carter, Inc. Agreements with its sales representatives in the United States as evidenced by the sales agreements (exhibits C and D) introduced in evidence by the Government were signed by Carter, Inc. Profit and loss statements (see exhibit B) are issued by Carter, Inc.

The fact that for the sake of economy the purely ministerial tasks of accounting and check signing are performed in Winnipeg does not change the transaction from bona fide sales into a principal-agent relationship.

This factual situation is entirely different from those in Robert E. Landweer & Co., Inc., etc. v. United States, 59 Cust.Ct. 648, R.D. 11359 (1967), aff'd, 63 Cust.Ct. 682, A.R.D. 261 (1969); Service Afloat, Inc., et al. v. United States, 66 Cust.Ct. 519, R.D. 11734, 322 F.Supp. 1396 (1971), relied upon by defendant. The record therein established the importer to be the exclusive selling agent of the manufacturer. This creates the relationship of principal and agent and the conduct of the parties was held to be repugnant to that of buyer and seller.

The case at bar is one which is compatible to buyer and seller notwithstanding the relationship between the parties. The existence of a parent-subsidiary relationship is no reason to preclude the finding of export value under section 402, *supra*. United States v. Acme Steel Company, 51 CCPA 81, C.A. D. 841 (1964). The fact that the billing was done by Carter, Ltd., and payment for the merchandise of the customers to Carter, Inc., in Winnipeg brings the facts involved close to that in Greb Industries, Ltd. v. United States, 64 Cust. Ct. 608, R.D. 11691, 308 F.Supp. 88 (1970). In that case sales were made by the Canadian manufacturer to its wholly owned subsidiary and the accounting service was performed by the Canadian corporation. The court in ar-

riving at its conclusion made the following observation:

> Finally, defendant asserts that "there is a question whether the transaction between * * * [Greb] as exporter and Bauer * * *, the alleged purchaser, is a sale, or, at least, whether the proof herein should have been more detailed to establish a sale."

As defendant points out, a sale is defined as a contract by which the absolute ownership of property is transferred from one person to another for a price, sum of money, or other consideration. J. H. Cottman & Co. v. United States, 20 CCPA 344, 356, T.D. 46114 (1932). The record in this case meets that test without contradiction. Nor is it material that the accounting records of Bauer are maintained in Kitchener at the offices of Greb and that the checks of Bauer are signed in Kitchener by officers of Greb who are also officers of Bauer. For the record shows that Bauer is a separate legal entity; it has its own warehouse in North Tonawanda, maintains its own bank account in the United States, and pays its own taxes in the United States. It pays for the goods it buys from Greb from its own account, and payment is due in 30 days as in all other sales by Greb. Further, it warehouses the merchandise until it resells it in the United States.

The mere fact that for the sake of economy the purely ministerial tasks of accounting and check signing are performed in Kitchener instead of North Tonawanda does not change the transactions from bona fide sales into something else. Simply because Bauer is a wholly owned subsidiary of Greb or that the one controls the other, or that the one allows its personnel to keep the books of the other, is insufficient to conclude that a transfer of goods from one to the other is not a bona fide sale within the meaning of section .402. What is more, the transactions must have been regarded as sales by the district director of customs because he appraised some of the goods upon the basis of the *resale* price by Bauer in the United States. This could only have been on the theory that the transfers to Bauer were absolute sales—otherwise there could not have been any sales in turn by Bauer.[2]

In summary, it is held that export value is the proper basis of appraisement and that the invoice prices represent such value. Judgment is entered accordingly.

Accordingly, I find the transactions between Carter, Ltd., and Carter, Inc., to be bona fide sales. The record, in my opinion, also establishes the necessary requisites for export value.

■ The next question presented is whether the prices at which Carter, Ltd., sold to Carter, Inc., fairly reflect the market value. In the previous cases involving this question it has been held that cost of production figures, or sales in the home market or to third countries were considered in determining whether the price fairly reflected market value. United States v. Acme Steel Company, *supra;* John V. Carr & Son, Inc. v. United States, 52 CCPA 62, C.A.D. 860 (1965); J. E. Bernard & Co., Inc. v. United States, 58 Cust.Ct. 598, R.D. 11265 (1967).

While this type of proof was offered and accepted in prior cases it does not make such proof mandatory in all cases. Basically the provision "fairly reflects the market value" was enacted to prevent the rigging of prices between related parties. The proof adduced in the case at bar establishes the O.E.M. accounts not related to Carter, Ltd., i. e., General Motors, American Motors, Cummins Engine, etc., all purchased at basically the same price as Carter, Inc. In addition to O.E.M. accounts, plaintiff's

---

2. It is to be noted that in R69/1391 the appraisement, as indicated in Customs Form 5561, was made at the 1967 Carter jobber price list, less certain allowances.

exhibit 1 establishes the sale of the merchandise involved herein to those considered to be comparable to O.E.M. accounts, i. e., General Trading and National Cooperative, both of which are not related and purchase at O.E.M. prices.

What better proof is there of the price fairly reflecting the market value when sales are made to other unrelated United States concerns at the same basic price. Since the level of distribution of the O.E.M. accounts and that of Carter, Inc., are the same for all intents and purposes the O.E.M. price given to Carter, Inc., fairly reflects the market value.

I therefore find as facts:

1. The merchandise consists of car warmers and engine heaters exported from Canada between August 25, 1967 and October 30, 1967, and entered at Pembina, North Dakota.

2. Said merchandise is not on the Secretary's final list, T.D. 54521.

3. Said merchandise was appraised on the basis of its purported export value as defined in section 402(b), Tariff Act of 1930, as amended by Customs Simplification Act of 1956.

4. Plaintiff contends that the invoice unit prices represent export value as defined in said section 402(b), Tariff Act of 1930, as amended.

5. During all times pertinent hereto said merchandise was produced and exported by James B. Carter, Ltd., Winnipeg, Canada.

6. In the ordinary course of trade, James B. Carter, Ltd., offered and sold such or similar merchandise for home consumption in Canada and for exportation to the United States.

7. The merchandise was invoiced by James B. Carter, Ltd., to James B. Carter, Inc., at various unit prices in U.S. dollars, with duty and freight payable by James B. Carter, Inc., and not included in the unit prices.

8. The merchandise was appraised on the basis of export value under section 402(b), Tariff Act of 1930, as amended, at various unit prices in U.S. dollars, less freight allowance of $2.60 per 100 pounds plus $1.50 surcharge, less brokerage and duties included.

9. At all times pertinent hereto James B. Carter, Ltd., sold such or similar merchandise for exportation to the United States only to selected purchasers, i. e., James B. Carter, Inc., and original equipment manufacturers, all of which were purchasers at wholesale, without restrictions as to the disposition or use of the merchandise by the purchasers.

10. The invoice prices were not lower than the prices at which James B. Carter, Ltd., offered or sold such or similar merchandise to unrelated purchasers.

11. The prices for exportation to the United States did not vary by reason of quantity sold.

12. At all times pertinent hereto Winnipeg was the principal market of Canada for the sale of merchandise such as the merchandise in dispute, for exportation to the United States.

13. The invoice prices included the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition packed ready for shipment to the United States.

I conclude as matters of law:

1. The invoice prices fairly reflect the market value of the merchandise for any quantities sold for exportation to the United States.

2. At the time of exportation to the United States, the invoiced prices were the prices at which such or similar merchandise was freely offered or sold in Winnipeg, the principal market of Canada, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, including the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

3. Export value, as defined in section 402(b), Tariff Act of 1930, as amended

by the Customs Simplification Act of 1956, is the proper basis for the determination of the value of the merchandise, and such value is the invoice value.

Judgment will be entered accordingly.