J. L. WOOD, Appellant,

v.

The UNITED STATES, Appellee.

Customs Appeal No. 74–21.

United States Court of Customs and Patent Appeals.

Dec. 5, 1974.

Barnes, Richardson & Colburn, New York City, attorneys of record, for appellant; Joseph Schwartz and Irving Levine, New York City, of counsel.

Carla A. Hills, Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Michael S. O'Rourke, New York City, for the United States.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

MILLER, Judge.

This appeal is from the judgment of the Third Division, Appellate Term, of the United States Customs Court, 71 Cust.Ct. 235, A.R.D. 319, 366 F.Supp. 1074 (1973), reversing the judgment of a single judge sitting in reappraisement, 68 Cust.Ct. 259, R.D. 11766, 340 F.Supp. 1398 (1972). We reverse.

## FACTS

The facts recited in the opinions below are not in dispute and may be summarized as follows: The imported merchandise consists of various engine heaters and car warmers manufactured by James B. Carter, *Ltd.*, of Winnipeg, Canada ("Carter, Ltd."), and exported to its wholly-owned American subsidiary, James B. Carter, *Inc.* ("Carter, Inc."). Carter, Inc., had no office of its own or any salaried employees, and all of its management, administrative, accounting, and billing operations were provided without charge by Carter, Ltd., in Winnipeg. The officers of Carter, Ltd., also served as officers of Carter, Inc., although none of them resided or worked in the United States. Sales [1] by Carter, Ltd., to the United States were made to Carter, Inc., and unrelated original equipment manufacturers ("OEMs"), such as General Motors, American Motors, and International Harvester. The sale terms and invoice prices to Carter, Inc., and the OEMs were the same inasmuch as they were considered to be on the same level in the chain of distribution. The imported merchandise was shipped by Carter, Ltd., directly to Carter, Inc., and the OEMs or by drop shipments straight to the next level in the chain of distribution. Sales by Carter, Inc., in the United States were conducted through sales representatives who were paid on a commission basis. Carter, Inc., maintained a substantial inventory in the United States, primarily at Fargo, North Dakota, in a public warehouse, which shipped the merchandise to approved accounts of Carter, Inc. A bank account in Fargo and separate books were maintained for Carter, Inc., which had its own price lists, warranties, and advertising and paid federal excise taxes to the United States.

Both parties agree that appraisement of the imported merchandise was properly based on export value as defined in section 402(b) of the Tariff Act of 1930, ch. 497, Pub.L. No. 361, 46 Stat. 708, 71st Cong., 2d Sess., as amended by the Customs Simplification Act of 1956, ch. 887, Pub.L. No. 927, 70 Stat. 943, 84th Cong., 2d Sess. (H.R. 6040).[2] The controversy arises over the fact that the appraisements were made, not on the basis of the invoice prices from Carter, Ltd., to Carter, Inc., but on the basis of sales at higher prices by Carter, Ltd., *through* Carter, Inc., *to* the customers of Carter, Inc.

## OPINIONS BELOW

The trial court concluded that Carter, Inc., was an independent entity, that the transactions between Carter, Ltd., and Carter, Inc., were bona fide sales, so that Carter, Inc., was a bona fide selected purchaser within the meaning of section 402(f)(1)(B), and that the parent-subsidiary relationship did not preclude a finding of export value. It concluded as a matter of law that the invoice prices from Carter, Ltd., to Carter, Inc., fairly reflected the market value of the imported merchandise, primarily because Carter, Inc., received the same price as the unrelated OEMs.

The appellate term reversed the judgment of the trial court, concluding that Carter, Inc., was an agent or alter ego

---

1. The significance of this term in the relationship between Carter, Ltd., and Carter, Inc., will be discussed infra.

2. 19 U.S.C. § 1401a(b).

**1402**

of Carter, Ltd., and that, therefore, the relationship between them was not that of seller and buyer. Accordingly, it held that the transactions between them must be disregarded in determining export value under section 402(b). It said that even assuming the transactions were bona fide sales, this did not prove that the invoice prices from Carter, Ltd., fairly reflected the market value; that the higher prices to warehouse distributors and jobbers in Canada demonstrated that the invoice prices to Carter, Inc., did not fairly reflect the market value, *notwithstanding that the OEMs in Canada paid prices comparable to those paid by the OEMs in the United States and by Carter, Inc.* Two separate concurring opinions were also filed, one apparently agreeing only that the record failed to establish that the invoice prices to Carter, Inc., fairly reflected the market value, and the other fully agreeing and commenting that proof independent of the prices to the selected purchasers (such as home market prices, third country prices, and exporter's production costs) was required to establish that the invoice prices fairly reflected the market value.

## OPINION

### Scope of Review

■ Prior to The Customs Courts Act of 1970, Pub.L. No. 91–271, 84 Stat. 274, 91st Cong., 2d Sess., this court had the power to review only questions of law in appeals involving reappraisement. 28 U.S.C. § 2637, codifying ch. 646, Pub.L. No. 773, 62 Stat. 982, 80th Cong.,

2d Sess. (1948). The 1970 Act amended 28 U.S.C. § 1541 to give this court full appellate jurisdiction over questions of both law and fact in reappraisement cases.[3] However, section 122 of the 1970 Act provided that the amendment to 28 U.S.C. § 1541 would become effective October 1, 1970, *except* in those proceedings involving merchandise entered before the effective date for which trial had commenced by such effective date. Since the merchandise in this case entered in 1967, and trial commenced July 1, 1970, this case falls within the exception to the effective date of section 122, and, therefore, this court can review only the questions of law involved.

### Legislative History and Intent of Section 402 as amended by the Customs Simplification Act of 1956

Section 402 of the Tariff Act of 1930, ch. 497, Pub.L. No. 361, 46 Stat. 708, 71st Cong., 2d Sess., as amended by the Customs Simplification Act of 1956, supra, provides as follows:

Sec. 402.   Value.

.    .    .    .    .    .

(b) *Export value.*—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation

3. The intent of Congress in repealing the prior restriction on this court's jurisdiction in reappraisement cases is clear from the following paragraphs contained in both the House and Senate committee reports (S. Rep.No.91–576, 91st Cong., 1st Sess. 13 (1969); H.R.Rep.No.91–1067, 91st Cong., 2d Sess. 12 (1970), U.S.Code Cong. & Admin. News 1970, p. 3188):

Section 102 amends section 1541 of title 28 of the United States Code, relating to the jurisdiction of the Court of Customs and Patent Appeals. The Court of Cus-

toms and Patent Appeals presently has authority to review questions of both law and facts in all protest cases but only questions of law in appeals for reappraisement cases.

Section 1541(a) gives the Court of Customs and Patent Appeals appellate jurisdiction in customs cases patterned after the appellate jurisdiction of the Court of Appeals. The Court of Customs and Patent Appeals will have authority to review all final judgments or orders of the Customs Court.

to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

(c) *United States value.*—For the purposes of this section, the United States value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal market of the United States for domestic consumption, packed ready for delivery, in the usual wholesale quantities and in the ordinary course of trade . . . . .

.   .   .   .   .   .

(d) *Constructed value.*—For the purposes of this section, the constructed value of imported merchandise shall be the sum of . . . ..

.   .   .   .   .   .

(f) *Definitions.*—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the mer-

chandise to usual purchasers at wholesale.

.   .   .   .   .   .

(4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value, United States value, or constructed value, as the case may be, can be satisfactorily determined:

(A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

.   .   .   .   .   .

(5) The term "usual wholesale quantities", in any case in which the merchandise in respect of which value is being determined is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.

(g) *Transactions between related persons.*—

(1) For the purposes of subsection (c) (1) or (d) of this section, as the case may be, a transaction directly or indirectly between persons specified in any one of the subdivisions in paragraph (2) of this subsection may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales in the market under consideration of merchandise of the same general class or kind as the merchandise undergoing appraisement. If a transaction is disregarded under the preceding sentence

and there are no other transactions available for consideration, then, for the purposes of subsection (d), the determination of the amount required to be considered shall be based on the best evidence available as to what the amount would have been if the transaction had occurred between persons not specified in any one of the subdivisions in paragraph (2).

(2) The persons referred to in paragraph (1) are:

(A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants;

(B) Any officer or director of an organization and such organization;

(C) Partners;

(D) Employer and employee;

(E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting stock or shares of any organization and such organization; and

(F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

While adding the definitions provision in section 402(f) and transactions-between-related-persons provision in section 402(g), the 1956 Act deleted foreign value as a basis of appraisement. The distinction between export and foreign value is concisely pointed out in a memorandum by the Tariff Commission contained in the Hearings on H.R. 6040 Before the House Comm. on Ways and Means, 84th Cong., 1st Sess. 9–10

(1955), hereinafter referred to as *"House Hearings"*:

The essential difference between "foreign value" and "export value" is that in the case of the former only sales for *domestic consumption* in the *country of exportation* are considered, while in the case of export value consideration is *confined* to *sales for exportation to the United States.* [Emphasis supplied.]

A major reason for deletion of foreign value as a basis of appraisement was to simplify and expedite customs administration by reducing the number of investigations made abroad.[4] However, when this was proposed, concern was expressed that tariff revenues and protection would be substantially reduced and that enforcement of the Antidumping Act of 1921 would be weakened. It was claimed that reduced tariff revenues and protection would result because sales to exclusive agents in the United States would become a basis for export value under the act.[5] The House responded by only adding a section to indicate that nothing in the Act should be construed to repeal or modify the Antidumping Act of 1921. The Senate responded by only adding another section which redesignated section 402 of the Tariff Act of 1930 as section 402a for an alternative value basis (19 U.S.C. § 1402) in order to prevent any sudden material change in valuation.[6]

The amendments to section 402 by the 1956 Act were designed to bring the United States customs valuation standards "more into conformity with the commercial realities of international trade." [7] It was said that the *definitions of the relevant terms* "would bring the valuation standards more into con-

4. S.Rep.No.2560, 84th Cong., 2d Sess. 3 (1956), hereinafter "S.Rep."; H.R.Rep.No. 858, 84th Cong., 1st Sess. 4 (1955), hereinafter "H.R.Rep."

5. House Hearings 44; Hearings on H.R. 6040 Before the Senate Comm. on Finance, 84th

Cong., 2d Sess. 80 (1956), hereinafter "1956 Senate Hearings."

6. S.Rep. 1–3.

7. H.R.Rep. 7.

formity with normal commercial practices." [8] With respect to the definitions in section 402(f)(1), the House Ways and Means Committee stated: [9]

> (6) A definition of "freely sold or in the absence of sales, offered for sale" is provided for the first time. It will permit determination of an "export value" or "United States value" on the basis of sales or offers which are unrestricted except for restrictions which are imposed or required by law, which limit the resale price or territory, or which do not substantially affect the value of the merchandise to purchasers. It will also permit the use of *sales to exclusive agents* and other restricted sales *where such sales fairly reflect the market value of the merchandise.* The present statute has been interpreted to make a "foreign value," "export value," or "United States value" unusable when the only offers made are subject to restrictions of the kinds stated. Furthermore, under the present law the price, in order to qualify, must be available to all purchasers. [Emphasis supplied.]

Also, it was pointed out in the hearings that the definition of "freely sold or offered for sale" in section 402(f)(1) would permit use of sales to exclusive agents.[10] Although the term "market value" in section 402(f)(1)(B) was not defined in the Act, it obviously must relate to the relevant market. In the case of export value, this would be the export market in the exporting country to the United States and *not the foreign domestic market*, since use of the latter would result in a determination of foreign value, which was deleted by the Act.[11]

■ From the foregoing, we conclude that Congress clearly intended that export value be determined by considering only the exporting country's market for exportation to the United States [12] and that sales at wholesale to exclusive or selected agents be used in determining export value if the prices fairly reflect the market value.[13] United States v. Acme Steel Co., 51 CCPA 81, C.A.D. 841 (1964) is hereby overruled to the extent that it approved consideration of sales in the domestic market of the exporting country in the determination of export value. Congress was well aware of the double pricing practices of foreign corporations and cartels,[14] and that elimination of foreign value and use of sales to exclusive agents would result in less tariff revenues and protection. However, the only measures it retained in lieu of foreign value were the Antidumping Act of 1921 and the alternative value basis of 19 U.S.C. § 1402; and the only restriction on use of prices to exclusive agents was the requirement that such prices fairly reflect the market value.

*Application of Law to This Case*

The "market value" which must be fairly reflected according to section 402(f)(1)(B) is the market value for

8. H.R.Rep. 4; see S.Rep. 3.

9. H.R.Rep. 10; see Hearings on H.R. 6040 Before the Senate Comm. on Finance, 84th Cong., 1st Sess. 17–18 (1955), hereinafter referred to as "1955 Senate Hearings."

10. House Hearings 29; 1955 Senate Hearings 18.

11. House Hearings 120; 1955 Senate Hearings 148.

12. There was a proposal that export value be determined upon exports to all countries, not just the United States, but this was rejected. House Hearings 57; 1955 Senate Hearings 62, 64–65.

13. Section 402(f)(1)(B) requires that the price to one or more selected purchasers be one which "fairly reflects the market value," not that the price reflect a *fair* market value. The prices to the selected purchasers are, therefore, to be measured against the market value and not some other standard such as costs of production.

14. House Hearings 36, 44; 1956 Senate Hearings 227; 102 Cong.Rec. 13263, 13266, 13282, and 13301 (1956) (Senate debate).

exportation to the United States (i.e., export value),[15] and this is the price which the merchandise is able to command in the market for exportation to the United States.[16]

In this case, we have all necessary market evidence, since Carter, Ltd., sells for export to selected purchasers in the United States—Carter, Inc., and the OEMs. The price to the OEMs and to Carter, Inc., is the same. Because the OEMs are unrelated to Carter, Ltd., or Carter, Inc., further proof of what price the merchandise is able to command in the market is not needed.[17] We join the trial court in saying: "What better proof is there of the price fairly reflecting the market value when sales are made to other unrelated United States concerns at the same basic price."

■ The appellate term considered a variety of factors in the relationship between Carter, Ltd., and Carter, Inc., in determining that the transactions between them were not "sales" and that Carter, Inc., was an agent of Carter, Ltd. However, the relationship (e.g. parent-subsidiary) between an exporter and an importer is not of itself controlling on the question of export value. United States v. Acme Steel Co., 51 CCPA 81, 87 C.A.D. 841 (1964). The requirements of a "sale" for purposes of sections 402(b) and 402(f) were not defined by the appellate term, but, as pre-

viously pointed out, the legislative history clearly shows that Congress intended use of sales to exclusive agents in determining export value; and there is nothing to indicate that the word "sales" was intended to have other than its ordinary meaning, namely: transfers of property from one party to another for a consideration.[18] Moreover, the record establishes that ownership of the imported merchandise was transferred from Carter, Ltd., to Carter, Inc., for a valuable consideration.

Although the parties are in dispute over whether the Customs Court "looked through" Carter, Inc., on the basis of agency principles as the government contends, or "pierced the corporate veil" as appellant argues, it is clear that the appellate term ignored the existence of Carter, Inc., and considered prices to buyers in Canada to sustain appraisements made on the basis of transactions by Carter, Ltd. (through Carter, Inc.) to jobbers in the United States. However, there is no evidence to show that Carter, Inc., was organized for an illegal purpose.[19] Indeed, appellee itself recognizes Carter, Inc., as the importer and does not propose to impose liability on either Carter, Ltd.,[20] or on the customers of Carter, Inc. Section 402(g) provides that transactions between related persons may be disregarded *only* for purposes of United States value or constructed value and not where export val-

15. House Hearings 120; 1955 Senate Hearings 148; see John V. Carr & Son, Inc. v. United States, 52 CCPA 62, 68, C.A.D. 860 (1965).

16. Chr. Bjelland & Co., Inc. v. United States, 52 CCPA 38, 43, C.A.D. 855 (1965).

17. Although not stated in either opinion below, it was apparently assumed that the sales to the OEMs were substantial, and this is substantiated by the record.

18. See J. H. Cottman & Co. v. United States, 20 CCPA 344, 356, T.D. 46114 (1932), cert. denied, 289 U.S. 750, 53 S.Ct. 695, 77 L.Ed. 1495 (1933). The phrase "freely sold or, in the absence of sales, of-

fered for sale" is defined in section 402(f)(1) only in terms of the types of buyers and the permissibility of certain restrictions. No definition of "sale" is given.

19. At oral hearing, counsel for appellant stated that it was easier for an American corporation to do business with U. S. customers than for a foreign corporation. Counsel for appellee was willing to speculate that Carter, Inc., was organized for a legitimate business purpose.

20. Even assuming Carter, Ltd., had imported the merchandise to itself, we can find no reason why the prices to the OEMs in the United States would not be the export value for the purposes of appraisement.

ue is involved.[21]  Moreover, the purchase orders of the jobbers were sent to and filled at a public warehouse in Fargo, North Dakota—activities wholly within the United States.  United States v. Massce & Co., 21 CCPA 54, 60, T.D. 46379 (1933).

In view of the foregoing, we hold that, for purposes of sections 402(b) and 402(f), the transactions between Carter, Ltd., and Carter, Inc., were "sales" and that the invoice prices therein involved fairly reflected the market value of appellant's merchandise.

The judgment of the Customs Court, Third Division, Appellate Term, is reversed.

Reversed.

21.  See H.R.Rep. 10;  House Hearings 12.