### CASCADE CORP.

v.

### UNITED STATES.

No. 75-2-00493;  C.D. 4757.

United States Customs Court.

Aug. 2, 1978.

Glad, Tuttle & White, Los Angeles, Cal. (Edward N. Glad, Los Angeles, Cal., of counsel), for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C. (Velta A. Melnbrencis, Trial Atty., New York City), for defendant.

FORD, Judge:

This action challenges the basis of appraisement and the appraised values of certain knuckleboom cranes. The cranes are of the 10C, 30C and 50C series with modifications and were manufactured by Toyo Umpanki Co., Ltd. of Japan (hereinafter referred to as "TCM") under patents held by plaintiff corporation.

Appraisement was made on the basis of constructed value as defined in section

402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165. The appraised values as agreed upon by the parties, were obtained from the manufacturer's suggested retail price list for the home market less $150,000 which represents the installation charge.

It is plaintiff's contention that said cranes are properly subject to appraisement on the basis of export value as defined in section 402(b), Tariff Act of 1930, as amended *supra*. Said value, it is claimed, is the invoiced unit prices.

The statutory provisions of section 402 of the Tariff Act of 1930, as amended *supra*, provide as follows:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \*

(d) CONSTRUCTED VALUE.—For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of,

that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

\* \* \* \* \* \*

(f) DEFINITIONS.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

\* \* \* \* \* \*

(4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value, United States value, or constructed value, as the case may be, can be satisfactorily determined:

(A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

(B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

(C) Merchandise (i) produced in the same country and by the same person as the merchandise undergoing appraisement, (ii) like the merchandise undergoing appraisement in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise undergoing appraisement.

(D) Merchandise which satisfies all the requirements of subdivision (C) except that it was produced by another person.

The record consists of the offcial papers which were received in evidence without being marked. Four exhibits were received on behalf of plaintiff as well as the testimony of two witnesses. Defendant introduced two exhibits which were received on its behalf.

■ Ordinarily, by virtue of 28 U.S.C. § 2635(a), the appraised value is presumed to be correct. However, in the case at bar, it has been agreed by counsel that the appraisement was based upon the manufacturer's suggested retail price list for sales in Japan. Inasmuch as the basis of appraisement is constructed value, the use of a price list to determine value, rather than utilizing the statutory requirements set forth in section 402(d) of the Tariff Act of 1930, as

amended *supra*, is patently erroneous. *Greb Industries, Ltd. v. United States*, 64 Cust.Ct. 608, R.D. 11691, 308 F.Supp. 88 (1970); *Ellis Silver Co., Inc. v. United States*, 63 Cust.Ct. 647, R.D. 11688, 308 F.Supp. 704 (1969), *aff'd* 67 Cust.Ct. 564, A.R.D. 293 (1971), *aff'd* 477 F.2d 946, 60 CCPA 143, C.A.D. 1100 (1973).

■ The permission granted to the appraising officer in ascertaining value to use "all reasonable ways and means" in section 500 of the Tariff Act of 1930, as amended by the Customs Courts Act of 1970, or the "best evidence available" as set forth in section 402(g), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, *supra*, is not carte blanche authority to contravene the statutory requirements of section 402(d) under which the appraisement herein was made.

Plaintiff contends the invoiced prices fairly reflect market value and that the negotiations for said prices were made at arm's length. The parties are not related within the provisions of section 402(g)(2) of the Tariff Act of 1930, as amended *supra*. The manufacturer does, however, manufacture said cranes as a licensee under patents held by plaintiff. TCM is the sole manufacturer of knuckleboom cranes in Japan. Plaintiff was granted the exclusive rights for the sale of said cranes in the United States as well as in certain other countries. (See paragraph 3, plaintiff's exhibit 2.) A royalty is paid by TCM to plaintiff on all sales of cranes manufactured by it except those sold to plaintiff.

Defendant claims plaintiff has failed to establish the incorrectness of the appraisement since it has not adduced testimony establishing the merchandise to be freely sold or offered for sale to anyone other than plaintiff. Additionally, as required in the case of a selected purchaser, defendant contends the sales were not made in the ordinary course of trade at prices which fairly reflect the market value.

■ Under the factual situation of this case involving a patented article produced by only one manufacturer in the country of

exportation and sold exclusively to plaintiff in the United States, the court is of the opinion that the merchandise is freely offered to a selected purchaser within the definition of section 402(f)(1)(B). *See also D. H. Baldwin Co., et al. v. United States,* 65 CCPA ——, C.A.D. 1208 (1978). The court is also of the opinion that such sales were in the ordinary course of trade as defined in section 402(f)(2). While said definition refers to merchandise of the same class or kind, the record, as indicated *supra,* is indicative of the fact that the imported patented crane is not of the same class or kind as cranes per se. Even if the court were to consider all cranes to be within the same basic category, there may be more than one manner of doing business in a particular industry. *Chr. Bjelland & Co., Inc. v. United States,* 52 CCPA 38, C.A.D. 855 (1965). In the case at bar the only knuckleboom cranes manufactured in Japan were sold exclusively to the plaintiff in the United States. Accordingly, such sales are in the ordinary course of trade.

■■■ In order to satisfy requirements that the price fairly reflects the market value as mandated in the case of a selected purchaser, plaintiff contends the sale prices were the result of arm's length negotiation. This has been sanctioned in *Spanexico, Inc. v. United States,* 64 CCPA ——, C.A.D. 1176, 542 F.2d 568 (1976); *D. H. Baldwin Co., et al. v. United States, supra.* Testimony that prices were negotiated at arm's length is not sufficient where the factual situation adduced does not support it. The mere fact that the manufacturer made a profit does not of itself establish the price as one which fairly reflects the market value. The prices were arrived at, according to the affidavit of Yukio Ikigaki, plaintiff's exhibit 1, by adding a 14 percent markup of TCM's cost for general expenses and profits. The market value which must be fairly reflected under section 402(f)(1)(B) is the price which the merchandise is able to command in the market for exportation to the United States. *J. L. Wood v. United States,* 505 F.2d 1400, 62 CCPA 25, C.A.D. 1139 (1974). Evidence along this line is lacking.

Exhibit B attached to exhibit 1 indicates a 40, 41 and 42 percent discount to original equipment manufacturers, both domestic and foreign, and is dated December 1, 1971. On the same date exhibit C attached to exhibit 1 indicates a 21 percent discount to distributors for both domestic and export sales.

The record indicates that $10,000 was paid by TCM for engineering design. With respect to the engineering fee, paragraph 5 of the agreement, plaintiff's exhibit 2, provides for an engineering fee of $10,000 per model group. Model group was defined as being within the load capacity range of each crane. There are three model groups before the court. However, only $10,000 was paid for the initial engineering fee on these three groups. A $50,000 fee was paid on Models 800/100 and 351 loaders which are not before the court. The agreement also provides that any substantial change or redesign required the payment of a fee to be determined by the parties not to exceed $10,000. According to witness Sorensen, there appears to have been redesign or changes for which he indicated the manufacturer was requesting increase in charges. Accordingly, they must have been substantial redesign changes. Except for the $10,000 paid on the initial engineering fee, there appears to be no further payment of the $10,000 fees required by the contract for the other two model groups, and there is no evidence of any engineering fees paid for redesign change. The fact that royalty fees were paid does not affect the engineering fees due since the agreement provides for payment of royalties in addition to engineering fees, as set forth in paragraph 8 of plaintiff's exhibit 2.

While witness Sorensen testified that each time there was an engineering change, TCM asked for price increases, the record nevertheless is to the contrary and establishes that the discount rate increased from 40–42 percent effective December 1, 1971 to 44–45 percent effective May 16, 1972. In addition defendant's exhibit B indicates discounts of 46 and 47 percent on Models 10C

and 50C effective October 1972. In any event, the actual prices paid in yen, as shown by plaintiff's exhibit 3 for the merchandise covered thereby for the period November 1971 to October 1973, establish the prices were reduced. The reduction referred to above is based on the prices paid in November 1971 compared to the prices paid in October 1973. The discounts set forth in defendant's exhibit A, dated May 16, 1972, also indicate a decline in the prices to Cascade for every model involved. In addition, the agreement between plaintiff and TCM, paragraph 7, provides for prices to be quoted to plaintiff semiannually at "a most favored basis." The fact that testimony was adduced to the effect that the original negotiations were based on the price list (exhibit A of plaintiff's exhibit 1) and after that each order was negotiated is not sufficient. Mr. Sorensen alluded to various correspondence in each negotiation but no supportive evidence was offered. Under the circumstances in this case, mere allegations of negotiations without supportive evidence are not sufficient to establish arm's length negotiations.

Accordingly, plaintiff has failed to establish an export value. The appraised values must, therefore, stand.

Judgment will be entered accordingly.