**SERVICE AFLOAT, INC., Howard Hartry, Inc.**

v.

**UNITED STATES.**

**R.D. 11761; Reappraisement R68/2791.**

United States Customs Court.

Jan. 19, 1972.

Glad & Tuttle, Los Angeles, Cal. (Edward N. Glad, Los Angeles, Cal., of counsel), for plaintiffs.

L. Patrick Gray, III, Asst. Atty. Gen. (Frederick L. Ikenson, New York City, trial attorney), for defendant.

MALETZ, Judge:

This appeal for reappraisement involves the proper dutiable value of a pleasure boat—invoiced as a "Grand Banks 36′ Twin Screw Cruiser #23"— that was exported from Hong Kong in May 1965 and entered at the port of Los Angeles in the following month. The boat was appraised by the government at $21,070, while plaintiffs claim the proper value is only $15,740.

The parties agree that the boat is not on the Final List (T.D. 54521) and that the correct basis of appraisement is export value as defined in section 402(b) of the Tariff Act of 1930, as amended (19 U.S.C. § 1401a(b)).[1]

The parties further agree that the issues of fact and law herein are the same as those decided in Robert E. Landweer & Co., Inc., a/c Robert Newton & Sons, Inc., et al. v. United States, 59 Cust.Ct. 648, R.D. 11359 (1967), aff'd, 63 Cust.Ct. 682, A.R.D. 261 (1969),

---

1. Section 402(b) of the Tariff Act of 1930, as amended (19 U.S.C. § 1401a(b)) reads in part:

(b) *Export Value.*—For the purposes of this section, the export value of the imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States * * *.

Section 402(f) of the Tariff Act of 1930, as amended (19 U.S.C. § 1401a(f)), which is also relevant, reads in part:

(f) *Definitions.*—For the purposes of this section—

(1) the term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

*        *        *        *        *

where the appraised values were affirmed. It is to be added that the record in the prior case has been incorporated here.[2]

■ The main issue is whether, as claimed by plaintiffs, Robert Newton & Sons, Inc., a California corporation (hereafter referred to as "Newton Corp.") was a selected purchaser of the boat from its manufacturer-exporter, American Marine Ltd. of Hong Kong (hereafter referred to as "American Marine"), or whether, as contended by the government, Newton Corp. was a sales agent of American Marine. More particularly, plaintiffs argue—as they did in the prior litigation—that Newton Corp. *purchased* the boat from the manufacturer, American Marine, at a net f. o. b. price (of $15,740 in the present case) and that appraisement should have been made at that price. Defendant, to the contrary, contends—as it did previously—that the Newton family controlled both Newton Corp. and the manufacturer-exporter, American Marine; that Newton Corp. was a sales agent for the manufacturer; and that the freely offered price at which the boat was sold by American Marine for exportation is represented by the appraised value.

On this issue, the court in the prior case found that Newton Corp., the alleged selected purchaser, was not an independent entity but rather was under the control of one Robert J. Newton or of American Marine; that Newton carried on or supervised the activities of Newton Corp., had the authority to manage its affairs and had a power of attorney to sign checks; that the profits of Newton Corp. did not inure to its stockholders but were distributed to the Newton family or to American Marine; and that there was nothing to indicate that

it ever acted independently of the Newtons. In these circumstances, the court held that Newton Corp. was the selling agent of American Marine rather than a bona fide selected purchaser and hence that the prices at which the boats in controversy were invoiced by American Marine to Newton Corp. did not represent export value.

In reaching this conclusion, the trial court made detailed findings of fact concerning American Marine and Newton Corp. and their relationship. The facts thus found provide important background for the present action and are, in summary, as follows: American Marine was formed in 1957 to engage in boat building in Hong Kong, with Robert Newton and his two sons, John and Whitney, owning 83 percent of the stock. Robert Newton, in addition, was American Marine's managing director until 1963 when he came to the United States. At that time, his son Whitney was placed in charge of its operations.

In February 1964, Robert Newton formed the Newton Corp. of Costa Mesa, California, after which he sought someone "to take over that corporation" and found one Thomas C. Carney. Eventually, Carney was named president of Newton Corp. and its stock was transferred to him. In April 1964, Carney signed a letter on the letterhead of Newton Corp. addressed to American Marine—which letter was countersigned by Robert Newton—stating in part that "I am to be sole representative for American Marine * * * for * * * the Grand Banks 36. * * * I will buy these boats at your offered prices and will sell them to the dealers at the prices you recommend. * * *"

Plaintiffs claimed that by this agreement Newton Corp. became the exclu-

---

2. Defendant's motion to dismiss the present appeal for reappraisement on the basis of collateral estoppel was denied by the court on the stated ground that application of collateral estoppel in the present case would result in an injustice for the following cumulative reasons: (1) The claim of estoppel was not interposed until after trial of the present action was completed and plaintiffs' brief in chief had been submitted; (2) plaintiffs, without objection by defendant, had presented new evidence; and (3) it could not be found that the new litigation was truly needless or redundant. *Cf.* J. E. Bernard & Co., Inc. v. United States, 66 Cust.Ct. 545, R.D. 11739, 324 F.Supp. 496 (1971).

sive purchaser. Additionally, plaintiffs sought to establish through the testimony of Robert Newton that Carney took over the operations of the Newton Corp. and that he, Robert Newton, never had any financial interest in its profits. The court found, however, that while Carney was connected with Newton Corp., Robert Newton personally had full authority, under a power of attorney, to sign checks, manage the office, make all loans and transact all the business of Newton Corp. It further found that Carney had never been in the boat business; that he knew nothing concerning the operation of such an enterprise; that while Carney ostensibly owned all the stock of Newton Corp., there was no evidence that he ever invested a dollar in the company or ever really managed the company; and that "[h]e was a mere pawn or tool for Robert Newton."

The court further noted that a large number of checks and check stubs of Newton Corp. indicated that the Newtons, particularly Robert, controlled completely the bank accounts of Newton Corp. and used the funds of that corporation for their personal expenses and for the benefit of other corporations. Although Robert Newton testified that these payments were made for repayment of personal loans the Newtons had made to Newton Corp., the court pointed out that there was no documentary evidence to support such testimony or Robert Newton's additional testimony that American Marine had originally loaned Newton Corp. some $40,000 to $50,000. On this aspect, the court observed (59 Cust.Ct. at 658–659):

> * * * While there is some oral evidence that Amer. Mar. did not share in any of the "profits" realized by the Newton Corp. and that the Newtons received no salary or compensation from Newton Corp., the documentary evidence shows innumerable payments by check to either Amer.

Mar., Robert Newton, John Newton, Whitney Newton, or other Newton family members, for personal uses of one or the other. These payments were allegedly made for repayment of loans or for repayment of travel disbursements. Books to support these allegations were not offered by the plaintiffs, and the Newton Corp.'s financial statement of December 31, 1964, part of collective exhibit D, reflects no such *liability* to any of the named persons or to Amer. Mar. It does reflect an *asset* of an account receivable *from* Amer. Mar. of $3,794.07, but there is nothing of record to show how that figure was arrived at. [Emphasis in original.]

Finally, the trial court made reference to two reports by a customs agent in which one of Robert Newton's sons, Whitney Newton, was quoted as telling the agent that Newton Corp. acts as selling agent for American Marine; that Newton Corp. was formed personally by Robert Newton to be the exclusive selling agent of American Marine; and that the majority of Newton Corp.'s profit went ito the Newtons. Commenting on these reports, the court said (59 Cust. Ct. at 663):

> When the conduct of the Newtons and their corporations are considered together with the information given by Whitney Newton to government agents *prior* to appraisement and before litigation * * * the reports are entitled to greater credence and weight than the testimony of Robert Newton and Thomas C. Carney given *after* appraisement and during litigation. To disregard the evidence contained in the reports, under the circumstances hereinabove indicated, would seriously undermine information obtained by reliable government agents designated for the purpose. * * *[3] [Emphasis is original.]

---

3. The appellate term made the following observations concerning these reports (63 Cust.Ct. at 688):

> In the instant case, the reports contain some material which is corrobora-

tive of other evidence and some which is in contradiction to the testimony of Mr. Robert Newton. Most of the contradictory material consists of information given to the agent by one

Against this background, plaintiffs presented additional evidence in the present case in an effort to prove that Newton Corp. was a purchaser from rather than an agent of American Marine. In this connection, it is to be noted that "the decisive consideration which distinguishes a principal-agent relationship from a buyer-seller relationship is the right of the principal to control the conduct of the agent with respect to the matters entrusted to him." Dorf International Inc., et al. v. United States, 61 Cust.Ct. 604, 610, A.R.D. 245, 291 F. Supp. 690, 694 (1968). Measured by this test, it must be concluded that the additional evidence thus presented by plaintiffs falls far short of establishing the independence of dealings as between Newton Corp. and American Marine that would be necessary to support a buyer-seller relationship.

Turning to that evidence, plaintiffs' first witness was Robert Newton, who had testified in the first case. He stated (on direct examination) that he had organized American Marine and was its president and general manager; that early in 1958 American Marine made an agreement with a company in the United States called Products of Asia under which American Marine sold boats for export to the United States only to Products of Asia; that this agreement was terminated in the latter part of 1963; and that thereupon he went to the United States and organized another distributorship, Newton Corp. Newton further testified that the arrangement between American Marine and Newton Corp. existed from January 1964 through the latter part of 1965 or early 1966 when Newton Corp. was phased out; and that during this time Newton Corp. was not instructed by American Marine as to how to carry out its business but rather was free to sell boats it purchased from American Marine to whomever it wished and at whatever price.

The force of this testimony, however— to the effect that Newton Corp. was a purchaser from rather than an agent of American Marine—was considerably impaired on cross-examination. Thus, on cross-examination Newton first denied that he had been an officer of Newton Corp. when it was organized, but then conceded that he had been its treasurer. He stated that he had been "an advisor only" to Newton Corp. but then admitted that when Carney was president, he (Newton) had full power, under Carney's power of attorney, to sign checks, manage the office, make loans and transact all the business of Newton Corp. He further testified that no other officer or director of Newton Corp. played any role whatever in the affairs of the company. For example, its initial president—whose name Newton could not recall—had no duties at all. Beyond that, Newton did not know whether there had been a vice-president and could not recall the names of the directors of the corporation; whether the directors had called any board meetings; or whether any stockholders' meetings had been called. He added that the secretary of the corporation had no duties other than its original "setting up."

In addition, Mr. Newton testified that he had authority as president and general manager of American Marine to lend that corporation's money and at the same time had authority as treasurer of Newton Corp. to borrow money for the latter concern. He stated that during the time he was treasurer of Newton Corp., he personally advanced money to it. He also stated that moneys were advanced to Newton Corp. by American Marine at the suggestion of its board of directors—which board consisted of himself and his sons. However, he then corrected himself and said that American Marine did not loan money to Newton Corp. but that he had done so personally although he could not remember the

---

of Mr. Newton's sons, who was in charge of American Marine Ltd. in his father's absence. Mr. Newton's testimony, moreover, is not so clear and convincing as to enable the court to

determine the status of the Newton company. Under these circumstances, the reports were properly considered together with other evidence. * * *

amount involved.[4] These personal loans, he added, were reflected in the books of American Marine so that in the event Newton Corp. did not repay him, American Marine could assume that responsibility. No note was issued for these "loans" nor was interest charged.

Plaintiffs' second witness, Whitney Newton, a son of Robert Newton and general manager of American Marine, testified that he too had loaned money to the Newton Corp. He stated that the "income" his father had sent him— in the form of checks drawn on the account of Newton Corp.—was in partial repayment of that loan. However, he later conceded that he could not have known what the payments were for. Additionally, no evidence was offered as to the amount of the purported loan; as to the existence of a note; or as to whether or not interest was charged.

Robert Newton's second son, John Newton, who was sales manager of American Marine, likewise testified that he had loaned money to Newton Corp. and was paid back partially. Again there was no evidence as to the amount of the purported loan; as to the existence of a note; or as to whether or not interest was charged.

In view of the foregoing considerations, this court—as did the court in the prior case—finds unpersuasive the testimonial allegations by the Newtons that they had made personal loans to the Newton Corp. and that the payments they received from that corporation for their personal expenses and other needs simply represented the bona fide repayment of one or more loans.

Plaintiffs argue, though, that a financial statement of Newton Corp. covering the years 1964 and 1965 that was prepared by an accountant-employee of a certified public accounting firm, coupled with the testimony of that accountant, proves beyond doubt that the Newtons had made loans to Newton Corp. and that the only money going to any of the Newtons from Newton Corp. was never in

excess of the loans made by the Newtons to that firm. There are several difficulties with this, however. In the first place, this Newton Corp. financial statement—which, it is worthy of note, the accountant prepared after conferring with Robert Newton—was unaudited and thus merely reflected unverified information that was given to the accountant by Newton Corp. Second, the accountant saw no document or note evidencing a loan by any of the Newtons to the Newton Corp. and, indeed, had no opinion as to whether any such loan had ever been made. Third, another unaudited financial statement of Newton Corp. likewise covering the year 1964 was prepared earlier by another accounting firm but fails to reflect any loans whatever from the Newtons to the Newton Corp. To explain away this and other major discrepancies in the two financial statements for 1964, Robert Newton testified that Carney (the president of Newton Corp.) furnished "incomplete" information to the accounting firm that prepared the first financial statement and that the second statement—which reflected loans from the Newtons to Newton Corp.—was the more complete. But this testimony that Carney furnished only "incomplete" information to the first accounting firm is at direct variance with the testimony of Carney himself who testified at the first trial that "we laid everything out to  *  *  * [that firm] to  *  *  * get the books into shape." In all these circumstances, no credence can be given to the entries in the second financial statement reflecting loans from the Newtons to Newton Corp.

■■ In the final analysis, the record in the present case reinforces the court's conclusion in the prior case that Newton Corp. was not a purchaser from American Marine but was rather the latter's selling agent. For, as in the prior case, the present record fails entirely to establish the independence of dealings necessary to support a buyer-

---

4. In the first case, Newton testified that American Marine loaned money to Newton Corp.

seller relationship as between Newton Corp. and American Marine, but shows instead that the Newton Corp. was under the control of the Newton family which also controlled American Marine. More particularly, the present record shows that Robert Newton and his sons controlled the affairs of American Marine and that at the same time Robert Newton had full authority to transact all business of the Newton Corp., including the authority to manage its office, sign checks and make loans.[5] On this score, what the appellate term of this court said in the prior case is fully applicable here (63 Cust.Ct. at 689):

> The facts and circumstances revealed by the record herein indicate that the Newton Company was not an independent entity but was under the control of Mr. Robert Newton or of American Marine Ltd. Mr. Newton carried on or supervised its activities and had the authority to manage its affairs. Its profits did not inure to the benefit of its stockholder, Mr. Carney, but were distributed to the Newton family or to American Marine Ltd. There is nothing to indicate that it ever acted independently of the Newtons.

In *Dorf International, Inc. et al. v. United States,* 61 Cust. Ct. 604, A.R.D. 245 (1968), the court pointed out that the decisive consideration which distinguishes a principal-agent relationship from a buyer-seller relationship is the right of the principal to control the conduct of the agent with respect to the matters entrusted to him. It also noted that the relationship is to be determined by the substance of the transaction, not by the labels the parties attach to it; that no single factor is determinative, and that an overall view must be taken of the entire situation. See also Park Avenue Imports v. United States, 62 Cust.Ct. 1035, A.R.D. 255 (1969).

A corporation may be an independent entity or it may be an agent of an individual or another corporation. Whether an agency exists is ordinarily a question of fact which may be established as any other fact, by direct or circumstantial evidence, and is to be determined from the agreements and acts of the parties. 3 Am.Jur.2d, Agency, sec. 21. A corporation may be an *alter ego* or business conduit of another and its separate corporate existence will not be recognized where it is so organized and controlled and its business conducted in such a manner as to make it merely an agency or instrumentality of the other corporation. 18 Am.Jur.2d, Corporations, secs. 15 and 17; Mayo v. Pioneer Bank & Trust Company, 270 F.2d 823 (1959) (reh. den., per curiam) 274 F.2d 320 (1960), cert. den. 362 U.S. 962, [80 S.Ct. 878, 4 L.Ed.2d 877] (1960); Schlamowitz v. Pinehurst, Inc., 229 F. Supp. 278 (1964); Forest Hill Corporation v. Latter & Blum, 249 Ala. 23, 29 So.2d 298 (1947).

On the record presented we find that the Newton Company was the selling agent of American Marine Ltd. and not a *bona fide* selected purchaser. Therefore, the prices at which the merchandise was invoiced to the Newton

---

5. As previously indicated, the trial court in the prior case considered two reports of a customs agent in which one of Robert Newton's sons, Whitney Newton, was quoted as saying that Newton Corp. acts as selling agent for American Marine; that Newton Corp. was formed personally by Robert Newton to be the exclusive selling agent of American Marine; and that the majority of Newton Corp.'s profits went to the Newtons. In the present case, plaintiffs have sought to discredit these reports · through the testimony of Whitney and John Newton who denied much of what the reports stated. The defendant, in turn, called the author of the reports as a witness and he testified as to their accuracy. Be that as it may, it is unnecessary for the court to resolve this conflict since the evidence of record, without even considering these reports, establishes beyond question that Newton Corp. was a selling agent of American Marine and not a bona fide purchaser.

Company do not represent export value, as that value is defined in section 402(b) and (f) of the Tariff Act of 1930, as amended.[6]

In sum, the appraised value is affirmed and the appeal for reappraisement is dismissed. Judgment will issue accordingly.

---

6. In view of the conclusion reached here that Newton Corp. was a selling agent of American Marine and not a selected purchaser, the court does not reach the question as to whether the price at which the boat in controversy was alleged to have been sold to Newton Corp. fairly reflected its market value.