**UNITED STATES**

v.

**J. L. WOOD.**

**A.R.D. 319; Reappraisement Nos. R69/593, R69/1208 and R69/1391.**

United States Customs Court, Third Division, Appellate Term. Nov. 9, 1973.

Irving Jaffe, New York City, Acting Asst. Atty. Gen., Patrick D. Gill, trial atty., New York City, for appellant.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz and Irving Levine, New York City, of counsel), for appellee.

Before LANDIS, MALETZ and NEWMAN, Judges.

MALETZ, Judge:

This is an application for review of the decision and judgment of the trial court sustaining the dutiable values claimed by the appellee (plaintiff below) in three consolidated appeals for reappraisement. 68 Cust.Ct. 259, R.D. 11766, 340 F.Supp. 1398 (1972).

The importations consisted of various engine heaters and car warmers [1] that were exported from Canada during the period of August 25, 1967 to October 30, 1967 by the manufacturer, James B. Carter, Ltd. of Winnipeg, Canada (hereinafter "Carter, Ltd.") to its wholly-owned American subsidiary, James B. Carter, Inc. of Fargo, North Dakota (hereinafter "Carter, Inc.").[2]

The imported merchandise was appraised on the basis of export value as defined in section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. § 1401a(b)) at various prices, less freight allowance, plus $1.50 surcharge, less included brokerage prorated, less included duty. These prices, appellant (defendant below) concedes, were predicated upon Carter, Inc.'s jobber price list, with appropriate "non-dutiable deductions." Thus, the appraisements were made on the basis of sales by Carter, Ltd. *through* Carter, Inc. *to* jobbers.

Appellee conceded before the trial court that export value under section 402(b) was the proper basis of appraisement. It argued, however, that the relationship between Carter, Ltd. and Carter, Inc. was that of seller and buyer rather than that of principal and agent. Hence, it contended that the transactions between the two were bona fide sales within the meaning of section 402(b); that Carter, Inc. was thus a "purchaser" within the purview of section 402(f)(1)(B) of the Tariff Act of 1930, as amended (19 U.S.C. § 1401a(f)(1)(B)); that Carter, Ltd.'s invoice prices to Carter, Inc. fairly reflected the market value of the imported merchandise under section 402(f)(1)(B); and that the proper dutiable values were therefore represented by Carter, Ltd.'s invoice prices to Carter, Inc. and not, as determined by the government appraiser, by Carter, Inc.'s jobber price list.

In contradistinction, the appellant argued before the trial court that Cart-

[1] Appellee has limited this case to the merchandise identified on the invoices by the following numbers: 782, 772, R–56, CU–10T, R–48, R–52, 11763–30, R–48A, R–52B and T–96B.

[2] The appeals for reappraisement were filed by the customhouse broker who made the entries on behalf of Carter, Inc. at the port of Pembina, North Dakota. It is to be noted that there is no evidence in the record to show the State in which Carter, Inc. was incorporated. See transcript of oral argument, pp. 54–5. See also *id.*, p. 25. Nor, for that matter, was any specific proof presented that Carter, Inc. was, in fact, a corporation, although there were indicia in the record to that effect. Thus, as did the trial court, we will consider Carter, Inc. to be a company incorporated in the United States.

er, Inc. was merely an agent or alter ego of Carter, Ltd.; that in light of such relationship, the transactions between Carter, Ltd. and Carter, Inc. were not bona fide sales within the meaning of section 402(b); that consequently Carter, Inc. could not be a "purchaser" within the purview of section 402(f)(1)(B) of the Tariff Act of 1930, as amended; and that in any event the various invoice prices did not fairly reflect the market value of the imported merchandise.

Against this background, the trial court sustained appellee's contentions and held that Carter, Ltd.'s invoice prices to Carter, Inc. represented the statutory export values. This holding was based upon the court's findings that Carter, Inc. was an independent entity and not merely an agent of Carter, Ltd.; that the relationship between Carter, Inc. and Carter, Ltd. was thus not inconsistent with that of buyer and seller; that the transactions between Carter, Ltd. and Carter, Inc. were therefore bona fide sales; and that Carter, Ltd.'s invoice prices to Carter, Inc. fairly reflected the market value.

Appellant contends here that the trial court erred in finding that the business relationship between Carter, Ltd. and Carter, Inc. was that of seller and buyer rather than that of principal and agent. It further contends that in the event Carter, Inc. was a purchaser, the trial court erred in finding that Carter, Ltd.'s invoice prices to Carter, Inc. fairly reflected the market value of the imported merchandise. Appellee, on the other hand, argues that the record as a whole fully supports the trial court's decision. For the reasons that follow, we agree with appellant's position and therefore reverse.

### Statutes Involved

The pertinent provisions of section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. § 1401a) are as follows:

(b) *Export Value.*—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the costs of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\*　\*　\*　\*　\*　\*

(f) *Definitions.*—For the purposes of this section—

(1) the term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

### The Record

The record establishes the following relevant facts: Carter, Ltd. of Winnipeg, Canada was engaged in the manufacture and sale of automotive electric heating products, among other items. Carter, Inc. was its wholly-owned American subsidiary. Carter, Inc. had no office of its own or any salaried em-

ployees, and all of its management, administrative, accounting and billing operations were provided without charge by Carter, Ltd. in Winnipeg. In this connection, the officers of Carter, Ltd. also served as officers of Carter, Inc.; however, none of these officers resided or worked in the United States, and no compensation was paid them for their services to Carter, Inc. Further, all of Carter, Inc.'s books and records were kept in Carter, Ltd.'s office in Winnipeg and distribution of Carter, Inc.'s corporate dividends was controlled by the corporate comptroller of Carter, Ltd.

The sales manager of Carter, Ltd. (Longworth) served also, without compensation, as the sales manager for Carter, Inc. He determined Carter, Inc.'s "resale" policies and prices as well as the sales policies and prices of Carter, Ltd. Longworth also did the purchasing for Carter, Inc. Thus, Longworth was "selling" the imported merchandise on behalf of Carter, Ltd. and at the same time "purchasing" it on behalf of Carter, Inc.

Turning now to distribution practices, the record shows that in Canada, Carter, Ltd. sold its products to warehouse distributors, mass merchandisers (such as Sears Roebuck) and original equipment manufacturers (hereinafter "OEMs") which included prominent manufacturers of automotive or mobile agricultural equipment (such as General Motors, American Motors, and International Harvester). The chain of distribution in Canada was as follows: Warehouse dis-

tributors sold the Carter products to jobbers, who in turn sold them to retail dealers (such as filling stations and garages), who in turn sold them to the ultimate users or consumers. OEMS in Canada had a comparable chain of distribution and also utilized Carter's automotive heating products in the manufacture of vehicles.

In addition to its Canadian operations, Carter, Ltd., during the period in question, made sales for exportation to the United States to OEMs; it also made "sales" without restriction to Carter, Inc.[3] The OEMs in the United States distributed the Carter products to their zone warehouses, who in turn sold them to distributing dealers, who in turn sold them to service stations, garages, or other retail outlets, who in turn sold them to the ultimate users or consumers. By contrast, Carter, Inc.'s "sales" in the United States were made to warehouse distributors and jobbers,[4] and were conducted through Carter, Inc.'s seven sales representatives who were paid by it on a commission basis, though their activities were supervised from Winnipeg by the staff and management of Carter, Ltd.[5]

The invoice prices to Carter, Inc.[6] were based upon the prices at which Carter, Ltd. sold to OEMs since Carter, Inc. was considered to be at the same level in the chain of distribution as the OEMs.[7]

When Carter, Ltd. invoiced a shipment to Carter, Inc., the bookkeeping entries were a debit to accounts receivable and a credit to sales. On the books of

---

3. It is to be noted that our use of the term "sales" here and hereafter is not meant to imply *ipso facto* that bona fide sales transactions took place.

4. Although Carter, Inc. was not prohibited by Carter, Ltd. from making "sales" to OEMs in the United States, no such "sales" were actually made. It is also to be observed that in addition to being engaged in the "sales" of products imported from Carter, Ltd., Carter, Inc. was engaged in sales of automatic timers and certain dip stick heaters that it purchased from suppliers in the United States.

5. In the contracts between Carter, Inc. and these sales representatives, the representatives were referred to as "*manufacturers'* representatives." [Emphasis added.]

6. These prices were in U.S. dollars with duty and freight payable by Carter, Inc. and not included in the unit prices.

7. Each invoice from Carter, Ltd. to Carter, Inc., and to an OEM in the United States bore the printed notation that Carter, Ltd. had manufacturing plants in Winnipeg and Montreal and "*sales offices*" in "Winnipeg, Montreal, Toronto, Vancouver, Edmonton, * * * and *Fargo, North Dakota.*" [Emphasis added.]

Carter, Inc. the transaction was recorded as a purchase. The terms of payment were net 30 days and payments were made to Carter, Ltd. by Carter, Inc. by checks drawn on its own account at the First National Bank and Trust Company in Fargo. If Carter, Inc. did not have enough money to pay Carter, Ltd., Carter, Ltd. would give Carter, Inc. a loan with which to pay accounts owing. Similarly, if Carter, Inc.'s cash balance in the Fargo bank was insufficient to cover such expenses as sales representatives' commissions, it would request a loan from Carter, Ltd. for the expenses and the necessary funds would then be deposited by Carter, Ltd. to Carter, Inc.'s account in the Fargo bank.

The merchandise was shipped by Carter, Ltd. to Carter, Inc. in either of two ways: shipments were made to a public warehouse in Fargo, which will be subsequently described; or, "drop shipments" were made directly by Carter, Ltd. to Carter, Inc.'s "customers" upon request. Approximately forty percent of the "sales" to Carter, Inc. involved drop shipments.[8]

Carter, Inc.'s bills were mailed out from Carter, Ltd.'s office in Winnipeg and stated: "Payable in U.S. funds. Please make check to James B. Carter, Inc., P.O. Box 962, Winnipeg, Manitoba, Canada." This post office box was also Carter, Ltd.'s mailing address in Winnipeg. When "customers'" checks were received by Carter, Inc. in Winnipeg, Carter, Ltd. personnel made the appropriate bookkeeping entries, prepared deposit slips and then mailed the funds to the First National Bank and Trust Company in Fargo for deposit in Carter, Inc.'s account.

Carter, Inc. maintained a substantial inventory in the United States, primarily at Fargo, North Dakota at the Union Storage and Transfer Company (hereinafter "Union Storage").[9] That company is a public warehouse and, as such, stores and handles merchandise for several hundred accounts, filling purchase orders sent to it and shipping the merchandise to the buyers. Carter, Inc. did not rent or lease any specific area or room in the warehouse, but nevertheless its inventory was kept in a separate room by the warehouse personnel. The name "James B. Carter, Inc." was lettered on a sign approximately 2½ by 3 feet near the front entrance of the warehouse.

Union Storage had a list of Carter, Inc.'s approved accounts, and orders sent directly to the warehouse were filled and shipped by a Union Storage employee who worked under the direction and overall supervision of Longworth. Copies of bills of lading for the orders shipped were mailed by Union Storage to Carter, Inc. in Winnipeg. Bills for storage and services were also mailed to Carter, Inc. in Winnipeg.

An employee of Union Storage, working under the direction of Longworth, was responsible for maintaining an inventory for Carter, Inc. and ordered additional merchandise from Carter, Ltd. to replenish the stock that had been shipped out to fill Carter, Inc.'s orders. Any payments received by the warehouse for merchandise shipped were forwarded to Carter, Inc. in Winnipeg.

Carter, Inc. issued its own warranty, and defective merchandise was returned by Carter, Inc.'s "customers" to Union Storage for replacement. Such defective merchandise was accumulated at the warehouse in Fargo until a quality control employee of Carter, Ltd. came down from Winnipeg and inspected it.

Carter, Inc. issued its own price lists, and in 1967 distributed approximately 16,000 catalogues in the United States. Also, it paid federal excise taxes to the United States.

Finally, it is to be noted that the only expenses incurred by Carter, Inc. were

8. Similarly, drop shipments were made by Carter, Ltd. for OEM accounts such as Cummins Engine and the Chevrolet Division of General Motors.

9. Although the record provides no details, "some inventories" were also maintained at Cleveland, Ohio.

for storage, commissions to sales representatives, advertising and catalogues; it incurred no expenses for salaries, office supplies, travel and legal fees.

*Whether the Business Relationship Between Carter, Ltd. and Carter, Inc. was that of Seller and Buyer or that of Principal and Agent*

The first issue confronting us requires determination of the business relationship between Carter, Ltd. and Carter, Inc. As to this, we are of the view, contrary to that of the trial court, that the relationship between the two was not that of seller and buyer. Rather, we are convinced by the overwhelming weight of the evidence in the record that Carter, Inc. was an agent or alter ego of Carter, Ltd., if not an actual sham.

The applicable principles were summarized as follows in C. J. Tower & Sons of Niagara, Inc. v. United States, 70 Cust.Ct. ——, ——, A.R.D. 312, 354 F. Supp. 858, 862 (1973) (appeal dismissed):

> * * * [I]t is established that "[a] corporation does not become an agent of another corporation merely because a majority of its voting shares is held by the other." Restatement, Agency (2d), § 14 M. See also *id.*, Appendix, § 14 M. And see e. g., Greb Industries, Ltd. v. United States, 64 Cust. Ct. 608, R.D. 11691, 308 F.Supp. 88 (1970); United States v. Acme Steel Company, 51 CCPA 81, C.A.D. 841 (1964). "[T]he decisive consideration which distinguishes a principal-agent relationship from a buyer-seller relationship is the right of the principal to control the conduct of the agent with respect to the matters entrusted to him." Dorf International, Inc., et al. v. United States, 61 Cust.Ct. 604, 610, A.R.D. 245, 291 F.Supp. 690, 694 (1968). Put otherwise, "[o]ne who contracts to act on behalf of another and subject to the other's control except with respect to his physical conduct is an agent and also an independent contractor." Restatement, Agency (2d), § 14 N. Whether a principal-agent or seller-buyer relationship exists "is to be determined by the substance of the transaction—not by the labels the parties attach to it. * * * No single factor is determinative; rather, the relationship is to be ascertained by an overall view of the entire situation, with the result in each case governed by the facts and circumstances of the case itself." Dorf International, Inc., et al. v. United States, *supra*, 61 Cust.Ct. at 610, 291 F.Supp. at 694.

It is to be added in this connection that if an overall view of the entire situation demonstrates that a corporation holds stock of another not for the purpose of participating in the affairs of the other corporation, in the normal and usual manner, but for the purpose of control, so that the subsidiary corporation is used as a mere instrumentality or department of the stockholding company, then the subsidiary company will be considered an agent or alter ego of the stockholding company. See e. g., United States v. Reading Co., 253 U.S. 26, 62–63, 40 S.Ct. 425, 64 L.Ed. 760 (1920); Ross v. Pennsylvania R. Co., 106 N.J.L. 536, 148 A. 741 (1930); Restatement, Agency (2d), Appendix § 14 M. And this, in our judgment, is precisely the situation presented here. For as we read the record, an overall view of the entire situation impels the conclusion (1) that every aspect of the entire business of Carter, Inc.—including its prices; sales and purchase policies; and other activities—was fully controlled and supervised by Carter, Ltd., and (2) that there was a complete lack of independence on the part of Carter, Inc.

This conclusion, we think, is compelled by the following factors in their totality: (1) Carter, Inc. had no office or warehouse of its own but maintained an inventory in a public warehouse in Fargo, North Dakota; (2) Carter, Inc. had no salaried employees; (3) the officers of Carter, Ltd. and Carter, Inc. were one and the same; (4) all these officers resided and worked in Canada and received their compensation from Carter,

Ltd.; none resided in the United States or worked in the United States or received any compensation from Carter, Inc. for any services to that company; (5) Longworth, the general sales manager of Carter, Ltd., also acted as the sales manager of Carter, Inc.; he resided in Canada; worked out of the offices of Carter, Ltd. in Winnipeg, Canada; received his entire salary from Carter, Ltd.; obtained no compensation whatever from Carter, Inc. for his services as Carter, Inc.'s sales manager; and thus was in actuality an employee of Carter, Ltd. and not of Carter, Inc.; (6) Longworth determined the prices and sales policies of Carter, Ltd.; he also determined the prices and sales policies of Carter, Inc. and made its purchases;[10] (7) the activities of Carter, Inc.'s seven sales representatives, who were paid by it on a commission basis, were supervised from Winnipeg by the staff and management of Carter, Ltd.; (8) in the contracts between Carter, Inc. and these sales representatives, the representatives were referred to as *"manufacturers' representatives"* [emphasis added]; (9) an employee of the public warehouse in Fargo, where Carter, Inc. stored its goods, worked under the direction and overall supervision of Longworth in maintaining Carter, Inc.'s inventories and making shipments when orders came in from approved accounts; (10) if merchandise shipped from the Fargo warehouse to a Carter, Inc. "customer" was returned to the warehouse on the ground that it was defective, a replacement shipment would be made and the defective merchandise would be kept in storage until a quality control employee of Carter, Ltd. came down from Winnipeg and checked it; (11) the activities of the Fargo warehouse on behalf of Carter, Inc. were always supervised from Canada by the staff and management of Carter, Ltd.; (12) bills for storage charges were sent by the Fargo warehouse to Carter, Inc. at post office box 962 in Winnipeg, which post office box also happened to be Carter, Ltd.'s mailing address in Winnipeg; (13) approximately 40 percent of the items in question were shipped directly from Carter, Ltd. in Canada to Carter, Inc.'s "customers" in the United States; (14) each invoice from Carter, Ltd. to Carter, Inc. and to an OEM in the United States bore the printed notation that Carter, Ltd. had manufacturing plants in Winnipeg and Montreal and *"sales offices"* in "Winnipeg, Montreal, Toronto, Vancouver, Edmonton, * * * and *Fargo, North Dakota"* [emphasis added]; (15) all the books and records of Carter, Inc. were kept in Carter, Ltd.'s office in Winnipeg; (16) the entire accounting staff performing services for Carter, Inc. was located at Carter, Ltd.'s office in Winnipeg and was paid by Carter, Ltd. without charge to Carter, Inc.; (17) all of Carter, Inc.'s management, administrative, accounting, invoicing and billing operations were provided by Carter, Ltd. in Winnipeg without charge to Carter, Inc.; (18) at no time was Carter, Ltd. reimbursed by Carter, Inc. for salaries Carter, Ltd. paid those of its employees who performed services for Carter, Inc; (19) the only expenses incurred by Carter, Inc. were for commissions to sales representatives, advertising, catalogues, and storage; it incurred no expenses for salaries, office supplies, travel, and legal fees, which expenses were assumed by Carter, Ltd.; (20) Carter, Inc.'s bills to its "customers" were mailed from Carter, Ltd.'s office in Winnipeg and stated "Payable in U.S. funds. Please make check to James B. Carter, Inc., P.O. Box 962, Winnipeg, Manitoba, Canada"—which post office box (as previously noted) was also Carter, Ltd.'s mailing address in Winnipeg; (21) when "customers' " checks were received by Carter, Inc. in Winnipeg, Carter, Ltd. personnel made the appropriate bookkeeping entries, prepared deposit slips, and then mailed the funds to the First National Bank and Trust Company in Fargo for deposit in Carter,

10. As previously pointed out, Longworth was "selling" the imported merchandise on behalf of Carter, Ltd. and at the same time "purchasing" it on behalf of Carter, Inc.

Inc.'s account; (22) if Carter, Inc. did not have enough money to pay Carter, Ltd., Carter, Ltd. would give Carter, Inc. a loan with which to pay accounts owing; (23) similarly, if Carter, Inc.'s cash in the Fargo bank was not sufficient to cover such expenses as sales representatives' commissions, it would request a loan from Carter, Ltd. for the expenses and the necessary funds would then be deposited by Carter, Ltd. to Carter, Inc.'s account in the Fargo bank; (24) distribution of Carter, Inc.'s corporate dividends was controlled by the corporate comptroller of Carter, Ltd.

To sum up, as stated previously, these factors in their totality convince us beyond any doubt that every aspect of Carter, Inc.'s business was fully controlled and supervised by Carter, Ltd. and that there was a complete lack of independence on the part of Carter, Inc. Indeed, we think it not too much to say that Carter, Inc. was nothing more than an alter ego of Carter, Ltd. and acted as a mere conduit for sales by Carter, Ltd. to wholesalers, warehouse distributors and jobbers in the United States. See e. g., C. J. Tower & Sons of Niagara, Inc. v. United States, *supra,* 70 Cust.Ct. ——, A.R.D. 312, 354 F.Supp. 858; Service Afloat, Inc. v. United States, 68 Cust.Ct. 225, R.D. 11761, 337 F.Supp. 458 (1972); aff'd, 70 Cust.Ct. ——, A.R.D. 311, 353 F.Supp. 885 (1973) (appeal dismissed); Robert E. Landweer & Co., Inc. v. United States, 63 Cust.Ct. 682, A.R.D. 261 (1969).

■ Nor do we believe that the factors considered by the trial court warrant the conclusion that Carter, Inc. was a buyer from rather than an agent or alter ego of Carter, Ltd. First, the court relied on the fact that Carter, Inc. had its own room in the Union Storage warehouse in Fargo where it maintained a substantial inventory and that the name "James B. Carter, Inc." was prominently displayed at the entrance to the warehouse building. But these considerations would seem of little significance when it is observed (1) that the activities of the Fargo warehouse on behalf of Carter, Inc. were always supervised from Winnipeg by the staff and management of Carter, Ltd.; and (2) that the employee of the warehouse who maintained Carter, Inc.'s inventories and made shipments when orders came in from approved accounts worked under the direction and overall supervision of Longworth who (as previously indicated) was in actuality an employee of Carter, Ltd. and not of Carter, Inc. The further consideration that a sign containing the name "James B. Carter, Inc." was conspicuously posted on the warehouse would seem to have no bearing whatever on whether Carter, Inc. was a buyer from or an alter ego of Carter, Ltd. Indeed, the sign would appear to be somewhat misleading inasmuch as Carter, Inc. did not even rent or lease any specific area or room in the warehouse, though a room was set aside for it by the warehouse.

The additional factor relied on by the trial court that Carter, Inc. paid its own bills to Union Storage for storage and handling would also appear to be of no moment in view of the fact that the activities of the warehouse on behalf of Carter, Inc. were supervised by the staff and management of Carter, Ltd.

The trial court also gave weight to the fact that Carter, Inc. had its own bank account at the First National Bank and Trust Company of Fargo. However, this factor, too, has little relevance since the record shows that without exception Carter, Inc.'s business with this bank was transacted through the mail with Carter, Ltd.'s accounting staff in Canada. There is also evidence in the record, as the trial court observed, that Carter, Inc. paid federal excise taxes in the United States. But in the absence from the record of any evidence showing the circumstances surrounding the payment of such taxes, it is not possible to determine what, if any, weight should be given to this factor.[11]

11. It is quite true that payment of taxes in the United States was a factor considered relevant in Greb Industries, Ltd. v. United States, 64 Cust.Ct. 608, 617, R.D. 11691, 308

Another factor deemed significant by the trial court was that Carter, Inc. had a number of sales representatives in the United States to whom it was liable for commissions on sales. However, this factor, in our judgment, has no probative value in light of the fact that the activities of these sales representatives were supervised from Winnipeg by the staff and management of Carter, Ltd. Also (as discussed previously), if Carter, Inc.'s cash in the Fargo bank was not sufficient to pay the sales representatives' commissions, it would request a loan from Carter, Ltd. for the necessary funds and such funds would then be deposited by Carter, Ltd. to Carter, Inc.'s account in the Fargo bank.

The trial court noted additionally that Carter, Inc. established its own resale prices in the United States, issued its own price lists, and disseminated its own catalogues in the United States. These factors, however, are scarcely relevant in establishing that Carter, Inc. was an independent buyer and not an agent or alter ego of Carter, Ltd., inasmuch as Carter, Inc.'s resale prices (which were set out in its price lists) as well as the sales policies included in its catalogues were determined by Longworth who (as noted before) was an employee of Carter, Ltd. and not of Carter, Inc.

The trial court also relied on the fact that Carter, Inc. purchased merchandise from suppliers in the United States, as well as from Carter, Ltd., and that Carter, Inc.'s trade policies differed from those of Carter, Ltd. But, when it is considered that Longworth, an employee of Carter, Ltd., purchased this merchandise on behalf of Carter, Inc. and was responsible for Carter, Inc.'s trade policies, these factors likewise have no relevance in proving that Carter, Inc. was an independent buyer.

Further, in the circumstances of this case, we do not think it consequential that Carter, Inc. issued its own warranty which was serviced at the warehouse by the replacement of defective merchandise. Aside from the fact that the issuance of the warranty was manifestly a sales policy and thus determined by Longworth, the record shows that when defective merchandise was returned to the warehouse, it was examined by quality control employees of Carter, Ltd. who came down from Canada for that purpose.

Other factors considered significant by the trial court were that bookkeeping entries of both Carter, Ltd. and Carter, Inc. reflected sales transactions; and that "sales" to Carter, Inc. were upon terms of net 30 days, in the same manner as other sales of Carter, Ltd. Again, however, these factors are, in our view, of no significance. For as we have previously noted: "[t]he sales manager of Carter, Ltd. (Longworth) served also, without compensation, as the sales manager for Carter, Inc. He determined Carter, Inc.'s 'resale' policies and prices as well as the sales policies and prices of Carter, Ltd. Longworth also did the purchasing for Carter, Inc. *Thus, Longworth was 'selling' the imported merchandise on behalf of Carter, Ltd. and at the same time 'purchasing' it on behalf of Carter, Inc.*" [Emphasis added.]

Lastly, the trial court pointed out that Carter, Inc. issued its own profit and loss statements. What is more important, though, is that these profit and loss statements were prepared entirely by Carter, Ltd. personnel.

Nor can we agree with the trial court's major reliance on Greb Industries, Ltd. v. United States, *supra,* 64 Cust.Ct. 608, 308 F.Supp. 88. In *Greb Industries,* the court found that Greb, a Canadian manufacturer, *sold* its skating outfits to Bauer Canadian Skate, Inc., its wholly owned subsidiary corporation

F.Supp. 88, 96 (1970). But in that case the taxes involved were federal income taxes and not excise taxes. In retrospect, it must be conceded that on further reflection we even have some doubt as to whether the payment

by a subsidiary company incorporated in the United States of federal income taxes is a relevant factor in determining whether a seller-buyer or principal-agent relationship exists.

in North Tonawanda, New York. For one thing, in contrast to the present case where Carter, Inc. had no office, warehouse or employees in the United States, Bauer maintained its own warehouse in North Tonawanda and employed its own warehouse manager. Second, unlike the present situation where some 40 percent of the items in question were shipped directly from Carter, Ltd. in Canada to Carter, Inc.'s "customers" in the United States, Greb never shipped ice skating outfits directly to jobbers or dealers in the United States, but, rather, shipped the outfits to Bauer for warehousing in North Tonawanda from which point *Bauer sold* the outfits to its retail dealers in the United States. Further, Bauer warehoused the merchandise until it resold it to purchasers in the United States. Third, in *Greb Industries,* Greb's selling prices to Bauer (and to all other wholesalers) were based upon the full cost of production plus a profit of at least 5 percent before taxes. Here, on the other hand, Carter, Ltd.'s invoice prices to Carter, Inc. were based upon the prices at which Carter, Ltd. sold to OEM accounts in the United States.[12] Fourth, the trial court indicated that (1) in the present case the activities of the parent company vis-a-vis its subsidiary were similar to the activities of the parent company in *Greb Industries* vis-a-vis its subsidiary; and (2) that on this aspect the court in *Greb Industries* stated (64 Cust.Ct. at 617, 308 F.Supp. at 96) that "[t]he mere fact that for

the sake of economy the purely ministerial tasks of accounting and check signing are performed in Kitchener instead of North Tonawanda does not change the transactions from bona fide sales into something else. * * * [Further, the fact] that the one allows its personnel to keep the books of the other, is insufficient to conclude that a transfer of goods from one to the other is not a bona fide sale within the meaning of section 402." [13]

It is quite true that here, similar to the situation in *Greb Industries,* (1) the ministerial tasks of accounting and check signing were performed in Canada by Carter, Ltd. for Carter, Inc., and (2) the parent corporation, Carter, Ltd., kept the books of Carter, Inc. But there the similarity ends. For in the present case, Carter, Ltd. did far more than perform the accounting and check signing for Carter, Inc. and keeping its books. On the contrary, the record here (as noted before) shows that in addition to these ministerial tasks, every aspect of the entire business of Carter, Inc., including its prices, sales and purchase policies, and other activities, was so fully controlled by Carter, Ltd. that Carter, Inc. was a mere instrumentality of Carter, Ltd. Indeed, so comprehensive and penetrating was the control exercised by Carter, Ltd. over the operations of Carter, Inc. that even the distribution of Carter, Inc.'s corporate dividends was controlled by the corporate comptroller of Carter, Ltd.[14]

12. The record indicates that prices to OEM accounts were often determined under negotiated conditions.

13. In *Greb Industries,* the court also stated that "[s]*imply because Bauer is a wholly owned subsidiary of Greb or that the one controls the other* * * * is insufficient to conclude that a transfer of goods from one to the other is not a bona fide sale within the meaning of section 402." *Ibid.* In the context of this paragraph, it is manifest that the term "control" was used only to indicate that the mere fact that one corporation controls another by virtue of stock *ownership is insufficient in and of itself to* constitute the subsidiary an agent or alter ego of the parent company. As discussed previously, it is only when control through

stock ownership is exercised in such a way that the subsidiary corporation is used as a mere instrumentality or department of the stockholding company that the subsidiary company will be considered an agent or alter ego of the stockholding company.

14. It should be noted that an appellate term of this court in C. J. Tower & Sons of Niagara, Inc. v. United States stated in a footnote that the present case, *J. L. Wood,* presented "a factual situation very similar to that in Greb Industries." 70 Cust.Ct. at ——, n. 4, 354 F.Supp. at 864, n. 4. It is to be added that the writer of this present *opinion was the judge who spoke for the* court in *Tower* and *Greb Industries.* With this in mind, the fact is that the above-quoted footnote statement in *Tower*—for which I

In sum, since, in our opinion, Carter, Inc. was acting as an alter ego for Carter, Ltd. in the sales of goods in the United States, the transactions in the present case purporting to be sales must necessarily be disregarded in determining export value under section 402(b) of the Tariff Act of 1930, as amended (19 U.S.C. § 1401a(b)). See e. g., C. J. Tower & Sons of Niagara, Inc. v. United States, *supra,* 70 Cust.Ct. ——, 354 F. Supp. 858; Service Afloat, Inc. v. United States, *supra,* 68 Cust.Ct. 225, 337 F. Supp. 458; Dorf International, Inc. v. United States, *supra,* 61 Cust.Ct. 604, 291 F.Supp. 690; Robert E. Landweer & Co., Inc. v. United States, *supra,* 63 Cust.Ct. 682.

*Whether the Invoice Prices to Carter, Inc. Fairly Reflected the Market Value of the Merchandise*

Even were we to assume that the business relationship between Carter, Ltd. and Carter, Inc. was that of seller and buyer, and that the transactions in question were bona fide sales, we cannot agree that the appellee has proven that Carter, Ltd.'s invoice prices to Carter, Inc. fairly reflected the market value of the merchandise in question. The trial court concluded to the contrary on the grounds (1) that Carter, Inc. and the OEMs in the United States were on the same level of distribution; (2) that Carter, Ltd.'s prices to Carter, Inc. were comparable to Carter, Ltd.'s prices to OEMs in the United States; and (3) that for these reasons Carter, Ltd.'s prices to Carter, Inc. fairly reflected the market value. However, even considering Carter, Inc. to be at the same level of distribution as the OEMs—a question we do not reach—it must be emphasized that as the parties agree, the OEMs were selected purchasers [15] and as such

had special standing. See Myerson Tooth Corporation v. United States, 64 Cust.Ct. 860, 862, A.R.D. 273, 313 F. Supp. 1016, 1018 (1970). In these circumstances, "in order to provike safecumstances, "in order to provide safeexport value through sales at non-market prices, comparison of home market selling prices with the invoice price to the selected purchaser * * * is an extremely important factor in determining whether the invoice price fairly reflects market value." Service Afloat, Inc. v. United States, 66 Cust.Ct. 519, 522, R.D. 11734, 322 F.Supp. 1396, 1398 (1971). See also e. g., Myerson Tooth Corporation v. United States, 61 Cust.Ct. 540, 544, R.D. 11597 (1968), aff'd, Id. v. Id., *supra,* 64 Cust.Ct. 860, 313 F.Supp. 1016; United States v. Acme Steel Company, 51 CCPA 81, C.A. D. 841 (1964). As was stated in *Myerson Tooth, supra,* 64 Cust.Ct. at 862, 313 F.Supp. at 1018:

* * * The selected purchaser is given the opportunity to demonstrate that despite his special standing, the price he pays is one which does indeed fairly reflect the market value of the merchandise. This places the focus of attention on the home market, that is to say, the market in the country of manufacture. From the price in that market a standard is established by which the price to the selected purchaser is judged. There is nothing in the statute to indicate that the market value to be used as a standard is restricted in scope to anything less than the value in the entire market of the country of manufacture. The language of the statute permits the use of information regarding all sales of such merchandise be they for home consumption or for consumption in other countries.

was responsible—was not only pure dictum, but also, based upon full examination of the record in the present case, clearly erroneous.

15. A selected purchaser situation results when the seller restricts his sales to one or more specifically designated purchasers and does not sell or offer its merchandise for

sale to all purchasers at wholesale. See e. g., Aceto Chemical Co., Inc. v. United States, 51 CCPA 121, 127, C.A.D. 846 (1964); C. H. Powell Co., Inc. v. United States, 67 Cust.Ct. 493, 498, n. 3, R.D. 11752 (1971), aff'd, 69 Cust.Ct. 257, A.R.D. 307 (1972).

Helpful also in setting out the criteria to be used in determining whether a price to a selected purchaser fairly reflects market value is the following statement in Robert E. Landweer & Co., Inc. v. United States, *supra*, 63 Cust.Ct. at 686:

One basis of comparison is the price at which the merchandise is sold for home consumption or for exportation to countries other than the United States. For this purpose all sales in the ordinary course of trade may properly be considered. United States v. Acme Steel Company, 51 CCPA 81, C.A.D. 841 (1964). * * *

Another basis which may be helpful in determining whether the price to the selected purchaser fairly represents market value is the cost of producing the merchandise, including overhead and profit. * * * A price which does not include all such elements does not *per se* fairly reflect the market value. John V. Carr & Son, Inc. v. United States, 52 CCPA 62, C.A.D. 860 (1965). * * *

With these considerations in mind, we cannot acquiesce in the proposition that is in effect advanced by the trial court, namely, that since the prices to a particular selected purchaser are equal or comparable to the prices to other unrelated selected purchasers at the same level of distribution, it necessarily follows that the prices to the particular selected purchaser fairly reflect market value. Our view, to the contrary, is that given the special standing of selected purchasers, the trial court, in determining that Carter, Ltd.'s prices to Carter, Inc. fairly reflected market value, chose an entirely inadequate basis of comparison, i. e., prices to other selected purchasers. For such a basis of comparison, without more, provides no safeguard whatever against the possible rigging of export value through sales to selected purchasers at non-market prices. To forestall that possibility, we would consider that in the present case an adequate yardstick in determining whether Carter, Ltd.'s prices to Carter, Inc. fair-

ly reflected the market value of the merchandise in question would be a comparison between Carter, Ltd.'s prices to Carter, Inc. and the prices at which Carter, Ltd. sold identical merchandise in Canada—the home market of the country of exportation.

On this aspect, it is undisputed that Carter, Ltd. sold merchandise identical to that involved here directly to warehouse distributors and jobbers in Canada at *higher* prices than the prices at which it sold to Carter, Inc. or to OEMs. For example, the record shows that Carter, Ltd. sold its model R–52 to warehouse distributors and jobbers in Canada at a price of $3.82 (U. S. dollars). On the other hand, Carter, Ltd. sold the same model R–52 to Carter, Inc. and OEMs in the United States at a duty excluded price of $1.55 (U. S. dollars). Thus, Carter, Ltd.'s price for the R–52 to warehouse distributors and jobbers in Canada was more than double its price to Carter, Inc. and OEMs. What is more, appellee failed entirely to explain the reason for the difference between Carter, Ltd.'s prices to warehouse distributors and jobbers in Canada and its prices to Carter, Inc. Such failure, in our judgment, necessarily defeats the selected purchaser claim here.

Additionally, what we consider the error of the trial court in relying solely upon the fact that Carter, Ltd. sold to other selected purchasers in the United States, i. e., OEMs, at prices comparable to the prices at which it sold to Carter, Inc. cannot be cured by the fact that Carter, Ltd. also sold to other OEMs in Canada at comparable prices. Certainly, the price at which the merchandise was freely sold in Canada to all purchasers at wholesale, i. e., warehouse distributors and jobbers, as well as OEMs, more fairly reflects the market value of the merchandise than the more favorable price at which the merchandise was sold only to OEMs. This is particularly true when it is considered that the *normal* practice of distribution in Canada was the sale by the manufacturer to the warehouse distributor and on down that

chain. In any event, the failure by appellee to present evidence explaining why Carter, Ltd.'s sales prices in Canada to warehouse distributors and jobbers were higher than its prices to OEMs in Canada simply vitiates the claim.

Finally, as previously mentioned, another basis which may be helpful in determining whether a price to a selected purchaser fairly represents market value is whether the price represented the exporter's cost of producing the merchandise, including overhead and profit. However, not a shred of evidence was presented by appellee as to the production costs of the merchandise in issue. Cf. United States v. F. W. Myers & Co., Inc., 63 Cust.Ct. 706, A.R.D. 264, 306 F. Supp. 1396 (1969) (appeal dismissed).

For all the foregoing reasons, we reverse the decision of the trial court and sustain the appraised values of the merchandise in question. Judgment will be entered accordingly.

LANDIS, Judge (concurring):

I concur in the result and incorporate herein the facts found by the trial judge below. I conclude, however, that the facts found below do not substantially establish that the price to Carter, Inc. fairly reflected the market value of the merchandise to a selected purchaser. I further find and conclude that the export value of the imported merchandise is the appraised value.

NEWMAN, Judge (concurring):

I agree with Judge Maletz' opinion that under all the facts and circumstances of this case Carter, Inc. was an agent or *alter ego* of Carter, Ltd. rather than a purchaser, and that the decision and judgment of the trial court should be reversed. And I agree with my colleague that even assuming *arguendo* Carter, Inc. was a purchaser, the trial court erred in holding that appellee had sustained its burden of proof under section 402(f)(1)(B).

I think it important, however, to add some further brief comments:

In my view, the trial court used an erroneous basis for determining that the invoice prices to Carter, Inc. fairly reflected the market value of the imported merchandise within the purview of section 402(f)(1)(B). That statute (unlike prior law) authorizes an export value to be predicated upon sales to "one *or more* selected purchasers at wholesale *at a price which fairly reflects the market value of the merchandise*". (Emphasis added.)

Judge Maletz' opinion discusses the special standing of selected purchasers, and the possible "rigging" of export value, through sales at "non-market" prices. Additionally, the opinion points up the importance of a comparison of home market selling prices with the invoice price to the selected purchaser in determining whether the invoice price fairly reflects market value. From that discussion and as I read the statute, I am clear that even where there are several selected purchasers buying at comparable prices from the exporter, as found by the trial court in this case, proof *independent of the price to the selected purchasers* (viz. home market and third country prices, exporter's production cost, etc.) is required to establish such price as fairly reflecting market value.

Here, the trial court's reliance solely upon sales to selected purchasers (the OEMs) in effect permitted selected purchaser prices to hoist themselves up by their own bootstraps to the status of export value.* Stated differently, the trial court made no determination that the selected purchaser prices to the OEMs fairly reflected market value. Nevertheless, those selected purchaser prices were used by the trial court as its sole basis for concluding that comparable prices to Carter, Inc., another selected purchaser, fairly reflected market value. Such holding obviously defeats the intent of section 402(f)(1)(B) to re-

---

* There is no dispute between the parties that the OEMs were selected purchasers.

quire that a price to one *or more* selected purchasers be shown, by proof independent of that price, to fairly reflect the market value of the merchandise.

The only independent proof submitted by appellee relates to sales in Canada which, in the case of warehouse distributors and jobbers, were at higher prices than to Carter, Inc., with no accounting by appellee for the difference in prices. Such failure to account for the difference in prices is fatal to appellee's claim that the lower selected purchaser prices to Carter, Inc. fairly reflected the market value.

Although the trial judge apparently was impressed by the fact that the OEMs were unrelated to Carter, Ltd., such fact does not alter the special status of the OEMs as selected purchasers. Indeed, section 402(f)(1)(B) significantly makes no distinction between related and unrelated selected purchasers. Thus, the rationale for requiring proof that a price to a selected purchaser fairly reflects market value is applicable whether the selected purchaser be related or unrelated.

True, in the recent decision in Ampex Professional Products Co. v. United States, 70 Cust.Ct. ——, A.R.D. 316 (1973), wherein the Second Division (Appellate Term) discussed the various criteria for determining whether a price fairly reflects market value, the statement appears that "[s]ales to other importers in the United States [i. e., Columbia Broadcasting System, a selected purchaser] may be utilized as in the case of J. L. Wood. v. United States, 68 Cust.Ct. 259, R.D. 11766 (1972) (application for review pending)". However, I believe that the views expressed by Judge Maletz and myself are more consistent with the intent and purpose of the requirement in the statute that sales to selected purchasers fairly reflect market value.

Accordingly, for these reasons, and for those reasons expressed by Judge Maletz, I concur that the decision and judgment of the trial court should be reversed.